# In the United States Court of Federal Claims

No. 16-1691C

(Filed:  January 26, 2022)

| | |
|---|---|
| **CITY OF WILMINGTON, DELAWARE,** | ) ) ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) ) |

*Paul T. Nyffeler*, Chem Law PLLC, Glen Allen, VA, for Plaintiff.  Of counsel were *Robert M. Goff* and *Rosamaria Tassone*, City of Wilmington Law Department, Wilmington, DE.

*Ann C. Motto*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, *Martin F. Hockey, Jr.*, Acting Director, and *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

### OPINION AND ORDER

*SOLOMSON*, **Judge.**

Shakespeare observed more than once that "the rain, it raineth every day."[1]  It may not rain every day in modern-day Wilmington, Delaware ("Wilmington" or the "City"), but the City charges its property owners monthly stormwater management fees.  This is a case about whether the United States government must pay, pursuant to the Clean Water Act, ten years of such fees the City assessed the government for five properties the United States Army Corps of Engineers ("USACE") owns in Wilmington.

---

[1] William Shakespeare, Twelfth Night, act 5, sc. 1; William Shakespeare, King Lear, act 3, sc. 2.

## I.     BACKGROUND

### A.  The Clean Water Act's Federal-Facilities Section — An Overview

The Clean Water Act requires federal property owners to comply with local water pollution laws.  33 U.S.C. § 1323 ("Federal facilities pollution control") (hereinafter the "Federal-Facilities Section").  Specifically, the Federal-Facilities Section subjects every "department, agency, or instrumentality of . . . the Federal Government" with "jurisdiction over . . . property" to "all Federal, State, interstate, and local requirements . . . respecting the control and abatement of water pollution."  *Id.* § 1323(a).  Thus, federal property owners must "pay[] . . . reasonable service charges" imposed by local governments to recover costs of stormwater management.  *Id.*  The Clean Water Act, in turn, defines a reasonable service charge as (1) "any reasonable *nondiscriminatory* fee, charge, or assessment" that is (2) "based on *some fair approximation* of the *proportionate contribution of the property* or facility *to stormwater pollution* (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility)" and (3) is "used to pay or reimburse the costs associated with any stormwater management program."  *Id.* § 1323(c)(1)(B) (emphasis added).

Because the meaning and application of the Federal-Facilities Section is central to the outcome of this case, the Court briefly traces its development.

### B.  Clean Water Act History

In 1948, Congress passed the Federal Water Pollution Control Act ("FWPCA"), the Clean Water Act's initial ancestral legislation.  Pub. L. No. 80-845, 62 Stat. 1155 (1948); *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 202 & n.2 (1976).  The law empowered the Surgeon General to create, in tandem with Federal and state agencies, "comprehensive programs" to reduce water pollution.  § 2(a), 62 Stat. at 1155.  The FWCPA, however, spawned a scattered, state-based system of water pollution control "designed to determine what lakes and streams had become polluted" and identify who had polluted them.  *Am. Frozen Food Inst. v. Train*, 539 F.2d 107, 115 (D.C. Cir. 1976).  Attempts to unscramble the polluted eggs after the fact proved "impractical."  *Id.*

Congress tinkered with the law in the following years.  For example, Congress enacted the Water Quality Act of 1965, Pub. L. No. 89-234, 79 Stat. 903, which required states to implement water quality standards and empowered the then-Department of Health, Education, and Welfare to promulgate such standards where particular states failed to do so.  Soon afterward, Congress passed the Water Quality Improvement Act

of 1970, Pub. L. No. 91-224, 84 Stat. 91, which required federal agencies to comply with water quality standards.

The first major revision of the FWPCA came with the Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816 (the "1972 Amendments"). Together with the 1972 Amendments, the law is more commonly known today as the Clean Water Act. *See DeKalb Cnty. v. United States*, 108 Fed. Cl. 681, 685 (2013) (discussing the 1972 Amendments). Among other changes, the 1972 Amendments addressed the backwards-looking orientation of the FWCPA by directly restricting the amount of pollutants that could be released into a state's navigable waters in the first place. *See EPA*, 426 U.S. at 204. As a result, polluters had to obtain National Pollutant Discharge Elimination System ("NPDES") permits from the EPA or a state *before* releasing pollutants into such waters. *Id.* at 205. States also were required to establish "total maximum daily loads" ("TMDLs") for various pollutants allowed to enter state waters.[2] 86 Stat. at 848 ("Each State shall establish for the waters identified . . . the total maximum daily load, for those pollutants which the Administrator identifies . . . .").

The 1972 Amendments also created the initial version of the Clean Water Act's Federal-Facilities Section, the current version of which is at issue in this litigation. In 1972, that section provided, in relevant part, that Federal agencies and instrumentalities "engaged in any activity . . . which may result, in the discharge or runoff of pollutants shall comply with . . . State . . . and local requirements respecting control and abatement of pollution . . . including the payment of reasonable service charges." 86 Stat. at 875.

In 1976, the United States Supreme Court's decision in *EPA v. California*, 426 U.S. 200 (1976), prompted Congress to further revise the Federal-Facilities Section. The Supreme Court held that although federal facilities must comply with state water pollution requirements like non-federal entities, the 1972 Amendments did "not expressly provide that federal dischargers must obtain state NPDES permits." *Id.* at 212. Rather, the Court held that the "requirements" the Clean Water Act imposed on federal property owners were only "effluent limitations and standards and schedules of compliance." *Id.* at 215.[3]

---

[2] TMDLs "are the maximum amount of a pollutant that a waterbody can assimilate and still achieve water quality standards." Plaintiff's Exhibit ("PX") 24 at WILM0011513.

[3] The Supreme Court issued a similar decision, related to the Clean Air Act, the same day the Court issued *EPA v. California*. *See Hancock v. Train*, 426 U.S. 167, 168–69 (1976) ("The specific question is whether obtaining a permit to operate is among those 'requirements respecting control and abatement of air pollution' with which existing federal facilities must comply under

In response, Congress amended the Clean Water Act's Federal-Facilities Section again in 1977 to clarify that federal facilities also had to comply with permitting requirements.  Clean Water Act of 1977, Pub. L. No. 95-217, §§ 60–61, 91 Stat. 1566, 1597–98 (the "1977 Amendments").[4]  The 1977 Amendments finalized much of the language of the Federal-Facilities Section as currently codified at 33 U.S.C. § 1323.  As noted above, Congress expressly required, among other things, that federal facilities "shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges."  33 U.S.C. § 1323(a).  Federal facilities are thus subject:

> (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.

*Id.*[5]  As noted above, and following the Supreme Court's terminology, we refer to that provision as "Section 1323" or the "Federal-Facilities Section."  *See U.S. Dep't of Energy  v. Ohio*, 503 U.S. 607, 614 (1992).

---

s[ection] 118 of the Clean Air Act." (quoting 42 U.S.C. § 1857f (1976)).  The Court held that the Clean Air Act, as written at the time, did not "subject[] federal installations to state permit requirements."  *Id.* at 198.

[4] According to the Senate Report on the 1977 Amendments:

> The act has been amended to indicate unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws.  Though this was the intent of the Congress in passing the 1972 Federal Water Pollution Control Act Amendments, the Supreme Court, encouraged by Federal agencies, has misconstrued the original intent.

S. Rep. No. 95-370, at 67 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4392.

[5] Although the Court recognizes that legislative history cannot displace or otherwise add to a statute's plain language, *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992), a contemporaneous Senate Report listed examples of "requirements" as including "requirements to obtain operating and construction permits, reporting and monitoring requirements, any

Finally, in 2011, Congress amended the Clean Water Act to define "reasonable service charges."  Federal Responsibility to Pay for Stormwater Programs Act of 2011, Pub. L. No. 111-378, 124 Stat. 4128 (codified at 33 U.S.C. § 1323(c)) (the "2011 Amendments").  The statute now defines "reasonable service charges" as follows:

> (c) Reasonable service charges
>
> (1) In general
>
> For the purposes of this chapter, reasonable service charges described in subsection (a) include any *reasonable nondiscriminatory* fee, charge, or assessment that is —
>
>> (A) based on *some fair approximation* of the *proportionate contribution of the property or facility to stormwater pollution* (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility); and
>>
>> (B) used to pay or reimburse the costs associated with any stormwater management program (whether associated with a separate storm sewer system or a sewer system that manages a combination of stormwater and sanitary waste), including the full range of programmatic and structural costs attributable to collecting stormwater, reducing pollutants in stormwater, and reducing the volume and rate of stormwater discharge, regardless of whether that reasonable fee, charge, or assessment is denominated a tax.

33 U.S.C. § 1323(c)(1) (emphasis added).

### C.  Wilmington's Stormwater Ordinance:  Wilmington Code § 45-53

Wilmington charges the owners of all properties within its corporate boundaries fees to recover the costs "related to all aspects of storm water management," including capital improvements, flooding mitigation, and watershed planning.  Wilmington, DE Code ("Wilmington Code") § 45-53(d).  The City first implemented the program in January 2007.  Joint Exhibit ("JX") 14 at WILM0000443; ECF No. 81 (Joint Stipulations of

---

provisions for injunctive relief and such sanctions imposed by a court to enforce such relief, and the payment of reasonable service charges."  S. Rep. No. 95-370, at 67.

Undisputed Fact ("JSUF")) ¶ 5.  The program's goal is "to enhance surface water quality by reducing the quantity and rate of stormwater runoff and the amount of pollutants discharged into the rivers, which occur as a consequence of separate stormwater discharges, [combined sewer overflows], and wastewater treatment plant discharges." JX 14 at WILM0000443.  The fees Wilmington assessed the government — and that are at issue in this case — are based on this local ordinance.

## II.  PROCEDURAL BACKGROUND

### A.  The Complaint

Wilmington filed its complaint against the government on December 22, 2016, seeking to recover "the payment of reasonable service charges" assessed for "the control and abatement of water pollution" pursuant to the Federal-Facilities Section.  ECF No. 1 ("Compl.") at 1–3.  The City filed an amended complaint on April 16, 2021, primarily to update the amounts for which Wilmington seeks to hold the government responsible. ECF No. 101 ("Am. Compl.").

The USACE owns five properties in Wilmington (the "Properties"), and Wilmington has assessed the USACE stormwater management fees for the Properties "from January 4, 2011 to present."  Am. Compl. at 5–13.  The City alleges that its stormwater management charges for the Properties are "reasonable service charges properly payable by the United States in accordance with Congress'[s] waiver of sovereign immunity under the Clean Water Act, 33 U.S.C. § 1323(a)."  Am. Compl. at 4.

Wilmington claims that the government owes the City $2,577,686.82 in principal charges and $3,360,441.32 in interest for "stormwater fees properly assessed to [the government's] property and facilities."  Am. Compl. at 4, 14.

### B.  Discovery and Summary Judgment Briefing

Earlier in this case, the parties cross-moved for judgment on the pleadings.  *See* ECF Nos. 15–17, 24–27; *see also City of Wilmington v. United States* (*Wilmington I*), 136 Fed. Cl. 628 (2018) (Williams, J.) (ECF No. 28).  Wilmington argued that the government, by not pursuing Wilmington's administrative appeal process under Wilmington Code § 45-53(d)(7), waived any challenge to the reasonableness of Wilmington's charges. *Wilmington I*, 136 Fed. Cl. at 629–30.  On March 14, 2018, Judge Williams denied both parties' motions.  *Id.* at 635.  Judge Williams rejected Wilmington's claim for two primary reasons: (1) Wilmington's appeal system is permissive, not mandatory; and (2) requiring the government to exhaust its local administrative remedies would severely prejudice the government.  *Id.* at 623–33.

The undersigned agreed with — and continues to agree with — Judge Williams' conclusion that the Wilmington Code does not provide that a party waives its right to defend against an assessment outside of the appeal process; nor, for that matter, does the Clean Water Act otherwise operate to preclude the government from defending against the City's charges in this Court. *Wilmington I*, 136 Fed. Cl. at 632. Relatedly, Judge Williams held that the government is not required to "exhaust" the City's administrative appeal process before defending itself in this Court against the City's claims on the grounds that its assessed charges are unreasonable and, thus, are *not* owed pursuant to what is otherwise a money-mandating provision of law. *Id.* at 632–33 (explaining that when Congress has not explicitly required the exhaustion of a particular administrative remedy, "sound judicial discretion" governs the application of the exhaustion doctrine).

Judge Williams reasoned that if Wilmington charged the government unreasonable fees, and the government did not appeal, an exhaustion requirement effectively would force the government to pay unreasonable fees, something the Clean Water Act's limited sovereign immunity waiver for "reasonable" charges does not require and, therefore, does not permit. *Wilmington I*, 136 Fed. Cl. at 633. Put differently, the Clean Water Act is only money-mandating with respect to "reasonable" charges and the government necessarily may defend against Wilmington's claims on the ground that the charges at issue are not reasonable and thus not owed pursuant to law.

Finally, the City's appeal process only permits adjustments to *future* billing cycles. Accordingly, even if the government had pursued the City's appeal process successfully — and this is an issue Wilmington continues to gloss over — that process would not have resulted in any change to the previously assessed fees at issue in this matter. *Wilmington I*, 136 Fed. Cl. at 632–33 (holding that the City's appeal process would not have provided the government with any remedy and that the government's true first opportunity to defend itself is in the instant case).

Following the discovery period, *see* ECF Nos. 30, 42, 54, 56, the parties filed their pretrial memoranda. ECF Nos. 60, 64.

On January 30, 2020, the United States filed a motion *in limine* to exclude the expert testimony of Mr. Hector J. Cyre. ECF No. 68. On January 31, 2020, Wilmington filed a motion *in limine* to (1) preclude the government from asserting certain arguments, (2) exclude the testimony of the government's expert witness, and (3) exclude several of its fact witnesses. ECF No. 69. On February 5, 2020, this case was reassigned to the undersigned judge. ECF Nos. 72, 73. On March 4, 2021, after both motions *in limine* were fully briefed, ECF Nos. 77, 78, the Court denied them. *City of*

*Wilmington v. United States* (*Wilmington II*), 152 Fed. Cl. 373 (2021) (ECF No. 91).  In *Wilmington II*, the Court once again rejected the City's administrative exhaustion argument that was rehashed from *Wilmington I*.  *Wilmington II*, 152 Fed. Cl. at 379–80.

On April 2, 2021, less than three weeks before trial was scheduled to begin, Wilmington filed a motion for reconsideration of *Wilmington I* and *Wilmington II*.  ECF No. 95.  The Court denied Wilmington's motion for reconsideration on April 6, 2021.  ECF No. 98.

## C.  The Trial

On April 19, 2021, trial commenced via videoconference due to health and safety considerations related to the COVID-19 pandemic.  ECF No. 89; ECF No. 93 (Pre-Trial Order) at 1 n.1.  Over two days, Wilmington presented evidence from one fact witness and one expert witness.  The City's lone fact witness, Ms. Kelly Williams, testified in her official capacity as the Commissioner of Public Works for the City.  *See* ECF Nos. 104, 105, Transcript of Proceedings ("Tr.") 40:10–11.  She testified, *inter alia*, as to the origins of the City's stormwater charge system, the process by which customers can appeal the City's charges, and the extent to which the Properties contribute to the City's stormwater pollution.  Tr. 39:20–248:3.

The City's expert witness, Mr. Hector Cyre, president of the engineering firm Water Resource Associates, testified regarding his professional experience within the stormwater management industry.  Tr. 279:10–282:3.  His testimony focused on the general reasonableness of Wilmington's stormwater methodology.  Tr. 274:15–425:23.

## D.  The Parties' RCFC 52(c) Briefing and Evidentiary Motions

On April 20, 2021, following the close of Wilmington's case-in-chief, the Court suspended trial to permit the government to file a motion for judgment on partial findings pursuant to Rule 52(c) of the Rules of the United States Court of Federal Claims ("RCFC").  Tr. 441:5–444:8; *see also* ECF No. 102.  On May 4, 2021, Wilmington filed a timely motion to admit portions of the RCFC 30(b)(6) deposition testimony taken from the government's witness, Craig Homesley, Chief of the USACE's Project Support Branch, as well as Plaintiff's Exhibits ("PX") 1, 4, 28, and 43.  ECF No. 106.  On May 18, 2021, the government filed its response to Wilmington's evidentiary motion.  ECF No. 112.  The government did not object to admitting the selected portions of Mr. Homesley's deposition, but sought to counter-designate and admit yet other portions of his deposition for context.  *Id.* at 3–4.  The government, however, opposed admitting Wilmington's four exhibits into the record.  *Id.* at 5–10.

On June 8, 2021, the Court granted Wilmington's motion to admit portions of Mr. Homesley's deposition testimony, in addition to the four exhibits: PX 1, PX 4 (but not pages numbered COE000077 and COE000080–82), PX 28, and PX 43. *City of Wilmington v. United States*, 153 Fed. Cl. 405, 410 (2021) (ECF No. 115). The Court also granted the government's request to enter its counter-designated portions of Mr. Homesley's deposition testimony into the evidentiary record. *Id.*

On June 21, 2021, the government filed a motion for judgment on partial findings pursuant to RCFC 52(c). ECF No. 117. On June 22, 2021, the government filed a corrected motion for judgment on partial findings. ECF No. 119 ("Def. Mot."). On August 5, 2021, Wilmington filed a response to the government's corrected motion for judgment on partial findings. ECF No. 121 ("Pl. Resp."). On August 11, 2021, the government moved for leave to file a reply, ECF No. 122, which the Court granted, Minute Order (Aug. 11, 2021). On August 13, 2021, the government filed its reply to Wilmington's response. ECF No. 123 ("Def. Reply").

## III.   FACTUAL FINDINGS[6]

### A. The Properties, Runoff, and Wilmington's Stormwater Management System

The USACE's five Wilmington Properties comprise a dredge material disposal area that the USACE uses in its work dredging the waterways near the City. JSUF ¶¶ 3, 121; JX 2. The Properties measure nearly 11,888,000 square feet, which translates to more than 270 acres. JSUF ¶¶ 133, 140, 147, 154, 161.

Some portion of precipitation that falls on the Properties runs off them and ultimately into the Christina or Delaware Rivers. JSUF ¶ 127; JX 17. Wilmington is subject to federal pollution requirements, including TMDLs, and runoff can increase the flow of pollutants into nearby water.[7] JX 14 at WILM0000443; JX 34 at WILM0010073–74. The City maintains a system of infrastructure to "enhance surface water quality by reducing the quantity and rate of stormwater runoff and the amount of pollutants discharged into the [nearby] rivers." JX 14 at WILM0000443; JSUF ¶¶ 6, 11 (describing the stormwater management program). The system consists of a stormwater collection

---

[6] This section constitutes the Court's principal findings of fact in accordance with RCFC 52(a) and 52(c). Other findings of fact and rulings on questions of mixed fact and law are contained in the discussion sections of this opinion, *see infra* Sections V and VI.

[7] The Christina Basin, "a 565 square mile basin" which "spans three states, Delaware, Pennsylvania, and Maryland," and includes the Christina River, is subject to TMDLs imposed by the EPA. PX 24 at WILM0011513.

and conveyance system and a wastewater treatment facility.  JSUF ¶¶ 7, 11.  The City's system is designed to protect surface water bodies, including the Brandywine River, the Christina River, and the Delaware River.  JSUF ¶ 8; JX 14 at WILM0000443; Tr. 178:21–25.

The stormwater collection and conveyance system is comprised of a combined sewer system and a municipal separate storm sewer system.  JSUF ¶ 11.  In times of heavy rainfall, stormwater runoff can combine with wastewater in amounts too great for the combined sewer system pipe capacity.  Tr. 179:1–5.  This can cause a combined sewer overflow event, during which wastewater and stormwater both flow into the rivers, polluting them.  Tr. 43:18–44:7.

While stormwater from at least one of the Properties "flows directly into [a nearby] [r]iver," it does so "with no use of the City's sewer system."  JX 17.  As a result, no stormwater from the Properties contributes to combined sewer overflows.  JSUF ¶ 15; Tr. 179:6–9.  Additionally, stormwater from the Properties does not enter Wilmington's combined sewer system or its municipal separate storm sewer system.  JSUF ¶ 14; Tr. 176:21–177:5.  In fact, the City is unaware of any pipes on the Properties that even "connect to [Wilmington's] stormwater collection and conveyance system." Tr. 145:8-13.  The Properties also do not use, or burden, the City's wastewater treatment plant.  Tr. 178:4–20.  The City does not know the proportional demand or burden, if any, that the Properties place on the nearby rivers.  Tr. 185:13–187:3.  The City does not know to which TMDLs the Properties contribute, if any.  Tr. 189:17–21.

### B.  Wilmington's Stormwater Charges: Purpose and Origins

The City imposes a monthly stormwater charge on the owner of each parcel of land in Wilmington.[8]  Wilmington Code § 45-53(d).  The City hired an engineering firm, Black & Veatch, to help develop its stormwater charge system, and Wilmington based its stormwater charge methodology on recommendations from that firm.  JSUF ¶ 5. Wilmington created the stormwater charge to, *inter alia*, recover costs of operating, managing, and upgrading stormwater infrastructure, including combined sewer overflows, and to comply with federal water pollution standards.  JX 34 at WILM0010075–76, WILM0010100–01; Tr. 159:24–160:13.

The stormwater charge provides Wilmington a revenue source with which to fund the stormwater management system for surface water quality management.  JSUF

---

[8] The City recently changed its billing cycle from quarterly to monthly.  *See* Wilmington Code § 45-53(d) ("All parcels . . . shall be assessed a *monthly* storm water charge . . . ." (emphasis added)).  Some of the parties' filings refer to the previous quarterly billing system.

¶¶ 17–18.  The City maintains revenue from stormwater charges in a fund separate from other City funds and uses the revenue exclusively for stormwater management purposes.  JSUF ¶¶ 115–19.

### C.  Wilmington's Stormwater Charge Formula

The City has enacted statutory provisions that govern its method for calculating stormwater charges; the applicable formula varies depending upon the type of property.  Wilmington Code § 45-53(d)(1)–(3).  The City cannot feasibly measure actual stormwater runoff or pollution for which each property in its jurisdiction is responsible; thus, the City's statutory stormwater charge formula attempts to approximate runoff or pollution attributable to each property.  JSUF ¶¶ 20–22.  But, as discussed below, the City's estimating and charging methodology differs depending on the type of property.

Specifically, to calculate the stormwater charge for nonresidential properties including the Properties at issue, the City uses a multifactor formula.  First, a property's total area (its "gross parcel area") is multiplied by a "runoff coefficient"[9] used to estimate the percentage of a property's surface area that generates water runoff based on the property's physical nature and topography.  Wilmington Code § 45-53(a); JSUF ¶¶ 40–41, 44; Tr. 125:23–127:8.  This produces the property's "impervious area,"[10] a number meant to approximate the surface area from which stormwater runs off the property.  Wilmington Code § 45-53(a).  That impervious area is then divided by an

---

[9] A "runoff coefficient" is a multiplier used to estimate impervious area.  Wilmington Code § 45-53(a).  Runoff coefficients range from .95 — a high multiplier used for relatively impervious properties like "parking structures," where most water runs off — to lower multipliers like the .25 used for properties like parks and cemeteries which presumably absorb more water.  *Id.* § 45-53(d)(3) (as delineated in Table 2); JSUF ¶¶ 40–41, 44; Tr. 125:23–127:8.  A coefficient of 1, for example, would mean all of the water runs off the property in question, while a coefficient of zero would mean that no water runs off but rather is completely absorbed.

[10] "Impervious area" is defined as:

> the total square feet of hard surface areas including buildings, driveways, any attached or detached structures, and paved or hard-scaped areas, or other surface areas that behave like an impervious area under wet weather conditions, that either prevent or restrict the volume of storm water that can enter into the soil, and/or thereby cause water to run off the surface in greater quantities or at an increased rate of flow than what would have occurred under natural undisturbed conditions.

Wilmington Code § 45-53(a); *see also* JSUF ¶ 23 (citing Wilmington Code § 45-53(a) for its definition of "impervious area").

"equivalency stormwater unit," or "ESU," of 789 square feet — which represents the size of the median single-family home in Wilmington.  JSUF ¶¶ 24–26.  The ESU serves as a common denominator of sorts to help property owners conceptualize the runoff for which their property is responsible, as compared to the size of the City's median property.  Tr. 79:6–80:8; 221:1–222:2; 326:1–327:19.  The impervious area divided by the ESU produces a property's ESU factor.  Wilmington Code § 45-53(a); JSUF ¶¶ 25–26, 45–47.  Finally, the property's ESU factor is multiplied by the specified charge rate per ESU, producing the City's monthly charge to the property owner.  JSUF ¶¶ 48–49; Tr. 326:9–22.

To illustrate the City's system, assume a hypothetical property of 100,000 square feet gross parcel area with a runoff coefficient of .4 — meaning that 40% of the property's area is estimated to be an impervious area from which stormwater runs off and presumably enters the City's stormwater management system.  *See* JSUF ¶ 40; Tr. 126:15– 127:8.  Because 40% of 100,000 is 40,000, the hypothetical property's estimated "impervious area" would be 40,000 square feet.  That estimated impervious area of 40,000 divided by the ESU of 789 produces an ESU factor of 50.697 — meaning that the property is about 50.697 times larger than the median single-family residence in Wilmington.  *See* Tr. 221:22–25.  If the rate per ESU for this property's categorization was $15, the property owner would owe $760.46 per month in stormwater charges.

The City obtains the first factor in the nonresidential formula — a property's "gross parcel area" — from the New Castle County (the "County") Department of Land Use.  JSUF ¶ 36.  The City assigns a "runoff coefficient" to a property based upon the stormwater class into which the City has categorized a property.  JSUF ¶ 37; Wilmington Code § 45-53(d)(3).  The City does not visit, or otherwise independently assess, properties, but rather categorizes them within a stormwater class based on an occupancy code the County has assigned to a particular property.  JSUF ¶¶ 38–39.

Black & Veatch, the engineering firm the City hired to help develop its stormwater charge system, recommended the fee methodology the City ultimately adopted.  JSUF ¶ 5.  Black & Veatch developed the runoff coefficients the City employs based on a set of coefficients outlined in a 1962 study called "Hydrologic Determination of Waterway Areas for the Design of Drainage Structures in Small Drainage Basins," authored by Dr. Ven Te Chow (the "1962 Study").  JX 14 at WILM0000451, WILM0000460.[11]

---

[11] William J. Hall & Marcelo H. García, *Ven Te Chow*, University of Illinois Urbana-Champaign, The Grainier College of Engineering, https://cee.illinois.edu/about/history/history-excellence/ven-te-chow (last visited Jan. 19, 2022).

At trial, the City's expert, Mr. Cyre, admitted that he did not know whether the occupancy codes reflected in the County's records — upon which the City based its stormwater classes and thus assigned impervious area coefficients — assumes the same stormwater characteristics as the categorizes used in Dr. Chow's 1962 Study or those used by the City.  Tr. 373:9–22.  Instead, Mr. Cyre merely "assume[d]" that Black & Veatch "had some basis" for correlating the City's land classes and the County's occupancy codes.  Tr. 373:18–21.  The City, however, is not involved in the County's process for setting occupancy codes, and the City does not verify the accuracy of the County's occupancy codes as applied to properties to calculate their stormwater charge. JSUF ¶ 33; Tr. 132:18–20.[12]

Wilmington also assesses interest on unpaid stormwater charges.  The City charges "1% for the first three months of nonpayment of charges, 1.5% for the second three months of nonpayment of charges, 2.5% for the third three months of nonpayment of charges, 3% for the fourth three months of nonpayment of charges, and 3% for each subsequent month after twelve months of nonpayment of charges."  JSUF ¶ 64 (citing Wilmington Code § 45-176(c)).

### D. Wilmington Applied Its Formula to the Federal Properties

For the five federal Properties at issue, Wilmington used the above-described formula to calculate and invoice the government $2,577,686.82 in stormwater charges (and $3,360,441.32 in interest) between January 1, 2011, and April 16, 2021.  Am. Compl. at 5–14; JSUF ¶¶ 138, 145, 152, 159, 166.

The City calculated those charges after assigning the Properties at issue to the "vacant" category.  JSUF ¶ 123.  The City defines a "vacant parcel" as "a parcel upon which there is no structure except for some marginal structure such as fencing, and which is assigned a 'Vacant' occupancy code in the assessor's records of the New Castle County Department of Land Use."  Wilmington Code § 45-53(a); JSUF ¶ 50.  The "vacant" class includes properties that "are not similar at all to one another" in terms of "land cover and size."  Tr. 165:20–166:5.[13]  Wilmington, moreover, has never visited the Properties.  Tr. 116:21–25.  Outside of categorizing the Properties into a stormwater class — based upon the County occupancy codes — and utilizing the Black & Veatch-assigned runoff coefficient, the City has not analyzed the Properties to

---

[12] Instead, the City's engineering firm examined the County's land categories, "made an engineering judgment" about which City runoff category (*e.g.*, commercial, residential) those land categories translate to, and applied to each runoff category "the high end of the [runoff coefficient] range" from Dr. Chow's 1962 Study.  Tr. 324:22–325:6.

[13] This singular fact proves fatal to Wilmington's case, as explained in detail below.

determine the volume or content of their stormwater runoff.  JSUF ¶¶ 179–180.  The City has never analyzed the Properties' actual impervious area.  Tr. 121:7–12.  Nor has the City ever analyzed whether the runoff coefficient assigned to the Properties reflects their physical characteristics.  Tr. 163:21–25.

In sum, the City's stormwater charges at issue in this litigation are "not based on any separate analysis by Wilmington, or any other entity, of the Properties' stormwater runoff."  JSUF ¶ 178.

### E.  General Limitations on the Accuracy of Wilmington's Formula

Wilmington believes that visiting the federal Properties to assess actual runoff would be "discriminatory" to other properties in the City unless USACE files a fee-adjustment application, Tr. 109:8–17, but the result is disparate treatment nevertheless: Wilmington calculates impervious area more accurately for residential than nonresidential properties.  For residential properties, impervious area calculations are "based on actual data on impervious area."  JSUF ¶ 34; *see also* JSUF ¶ 35 ("Impervious areas for condominium properties are based on 'actual impervious areas.'").  In contrast, to calculate impervious area for residential properties, the City obtains from the County records the actual square footage of structures on the property, but does not count "paved surfaces, such as driveways or patios or sidewalks."  Tr. 122:10–19; 123:13–19.  The County tax assessment system does not maintain that data for nonresidential parcels.  JSUF ¶ 31.  For example, with respect to the 60 condominium properties that existed when the City's engineering firm developed its stormwater user fee methodology, Wilmington used "a combination of [Geographic Information System] and aerial imagery to individually determine impervious areas."  Tr. 125:1-9.  The City did not use that or any similar method to calculate the impervious area of the Properties at issue.  Tr. 125:10-13.

Accordingly, while Wilmington "does not differentiate between Federal and private properties" when levying stormwater charges, JSUF ¶ 172; Tr. 107:10–13, the City admits that "it is likely in some situations, the resulting measure of imperviousness may differ from the actual imperviousness that exists in a specific property."  JX 14 at WILM0000452; *see also* Tr. 169:17–22 (Commissioner Williams agreeing that it is "likely in some situations that Wilmington will assess a charge that is based on the wrong impervious area measurements"); Tr. 169:23–170:13 (Commissioner Williams testifying that she does not believe the Properties were assigned a "significantly higher" measure of imperviousness than their actual imperviousness).

Wilmington has not changed or amended its stormwater methodology since the 2011 Clean Water Act amendments updated the statute to define the term "reasonable service charges." Tr. 106:18–107:9; *see also supra* Section I.B.

## F.  Wilmington's Appeal System

As explained above, the City provides a limited appeal process for stormwater charges; nonresidential property owners can file fee adjustment requests with the City if they believe there was an error in the charge calculations.  JSUF ¶¶ 103–04.  Property owners can appeal: "(1) the calculation of the storm water charge; (2) the assigned storm water class; (3) the assigned tier, if applicable, and (4) the eligibility for a credit." Wilmington Code § 45-53(d)(7).  The appeal process is limited, however, because it applies *solely to future charges*.  JSUF ¶ 112 ("Wilmington's appeal process only applies prospectively (or only on a 'go-forward' basis)."); Wilmington Code § 45-53(d)(7)(b) ("The filing of a notice of appeal shall not stay the imposition, calculation or duty to pay the storm water charge; the appellant shall pay the storm water charge, as stated in the billing.").  The City confirmed this at trial.  Tr. 71:1–6, 102:23–103:4.  The appeal process simply does not provide for adjustments of prior billing cycles.  JX 40 at WILM0012020 ("There will be no retroactive adjustments for prior billing periods.").

Moreover, a property owner must pay all fees before the City will even consider an appeal.  JX 40 at WILM0012021 ("All stormwater charges that are outstanding at the time of the application must be paid in full prior to the City commencing the technical review.  Any storm water charge bill that is received during the adjustment appeal application review process need[s] to be paid in full."); Tr. 103:5–15 (Commissioner Williams testifying that the City "will not consider an application unless . . . your outstanding fees are up to date").[14]

## G.  The United States Refuses to Pay

The United States did not pay the stormwater charges or associated interest Wilmington assessed on the five Properties.  JSUF ¶¶ 139, 146, 153, 160, 167.  The United States did not appeal the charges assigned via the City's appeal process.  JSUF ¶ 168; *Wilmington I*, 136 Fed. Cl. at 630 ("Defendant did not bring an administrative

---

[14] Thus, if Wilmington were correct that the government is required to follow the City's appeal process, the government would have to pay its assessed fees — whether reasonable or not — and then sue for their return irrespective of whether the appeal process was successful (because the appeal process does not impact charges already assessed).  In the Court's view, the City's position makes little sense and would incorrectly reverse the burden of proof with respect to what is otherwise the City's money-mandating claim against the government pursuant to the Clean Water Act's Federal-Facilities Section.

appeal . . . ."); *Wilmington II*, 152 Fed. Cl. at 380 ("the government did not utilize Wilmington's administrative appeal process").

Wilmington thus claims it is owed the amounts it has invoiced the government for its Properties. Am. Compl. ¶¶ 2, 29, 34, 39, 44, 49.

## IV. JURISDICTION AND STANDARD OF REVIEW

The Tucker Act is this Court's primary jurisdictional statute; it provides, in relevant part, as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States *founded either upon the Constitution, or any Act of Congress or any regulation of an executive department*, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (emphasis added). Where a plaintiff seeks compensation from the government based upon a provision of the Constitution, a statute, or regulation, this Court only has jurisdiction where the plaintiff demonstrates that its claim is based on a substantive law that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 219 (1983). Such a claim is called a money-mandating claim. *See, e.g., Maine Cmty. Health Options v. United States*, 590 U.S. --, 140 S. Ct. 1308, 1328 (2020) (holding that a statute falls within the Tucker Act's sovereign immunity waiver when it "creates 'a right capable of grounding a claim within the waiver of sovereign immunity if, but only if, it can be fairly interpreted as mandating compensation by the Federal Government for the damage sustained'" (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003))); *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (noting that, for money-mandating claims, "the allegation must be made that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum").

This Court already has concluded, and the parties do not dispute, that the Clean Water Act's Federal-Facilities Section, 33 U.S.C. § 1323, is a money-mandating statute. *See Wilmington I*, 136 Fed. Cl. at 631 ("Section 1323(a) of the Clean Water Act 'may fairly be interpreted to mandate the payment of money by the government' because it mandates that the United States 'shall' pay 'reasonable service charges.'" (quoting *DeKalb Cnty.*, 108 Fed. Cl. at 696)). This Court thus has jurisdiction to decide

Wilmington's claims that the government owes the City money pursuant to that statute. *See* Am. Compl. ¶ 3.

Pending before the Court is the government's motion for judgment on partial findings pursuant to RCFC 52(c), in which the government argues that Wilmington failed to meet its burden of proof at trial. *See* RCFC 52(c) ("If a party has been fully heard on an issue during trial and the court finds against the party on that issue, the court may enter judgment against a party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."). In particular, the government argues that Wilmington did not demonstrate that the stormwater charges it assessed the government for its Properties were "reasonable service charges" pursuant to the Federal-Facilities Section, 33 U.S.C. § 1323(c). Def. Mot. at 2.

In resolving the government's motion, "the judge, as the sole trier of fact, may weigh the evidence and is not required to resolve all issues of evidence and credibility in the plaintiff's favor." *Persyn v. United States*, 34 Fed. Cl. 187, 195 (1995), *aff'd*, 106 F.3d 424 (Fed. Cir. 1996). Rather, after hearing the plaintiff's evidence, the Court "determine[s] whether or not the plaintiff has convincingly shown a right to relief." *Fifth Third Bank of W. Ohio v. United States*, 56 Fed. Cl. 668, 683 (2003) (quoting *Howard Indus., Inc. v. United States*, 115 F. Supp. 481, 485 (Ct. Cl. 1953). "The trial may end at the close of a plaintiff's case if a plaintiff has failed to maintain its claim, RCFC 52(c), because '[a] plaintiff has no automatic right to cross-examine a defendant's witnesses for the purpose of proving what the plaintiff failed to establish during the presentation of its case.'" *Columbia First Bank, FSB v. United States*, 60 Fed. Cl. 97, 101 (2004) (quoting *Cooper v. United States*, 37 Fed. Cl. 28, 35 (1996)); *see also Penna v. United States*, 153 Fed. Cl. 6, 18 (2021) (discussing the procedure and standard of review for RCFC 52(c) motions). In other words, "[t]he time for plaintiff to prove its case is during its case-in-chief." *IMS Eng'rs-Architects, P.C. v. United States*, 92 Fed. Cl. 52, 75 (2010) (citing *Cooper*, 37 Fed. Cl. at 35).

## V.     THE COURT GRANTS THE GOVERNMENT'S RCFC 52(C) MOTION

As explained above, the Clean Water Act only waives the federal government's sovereign immunity to Wilmington to sue for "reasonable service charges." 33 U.S.C. § 1323(a), (c); *DeKalb Cnty.*, 108 Fed. Cl. at 695. The "reasonable service charges" for which the United States is liable include only "reasonable nondiscriminatory fee[s], charge[s], or assessment[s] that [are] . . . based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution . . . and . . . used to pay or reimburse the costs associated with any stormwater management program[.]" 33 U.S.C. § 1323(c)(1). Wilmington failed to carry its burden

to prove that its charges were "reasonable service charges" within the meaning of the statute. *Id.* Therefore, the government is not liable pursuant to the Clean Water Act to pay Wilmington's service charges as assessed and claimed in this suit, and the government is entitled to judgment.[15]

Simply put, the facts demonstrate, if anything, that the City's charges to the government do not represent "some fair approximation" of the Properties' relative (*i.e.*, "proportionate") contribution to stormwater pollution.

### A. Wilmington Failed to Prove that Its Stormwater Charges Are "Reasonable Service Charges" Pursuant to the Clean Water Act

Although the charges Wilmington assessed the government for the Properties are the product of a statutory scheme that may be facially reasonable in some general, layman's sense, the Court concludes that the City's charges fail the statutory definition of "reasonable services charges." The relevant question, in that regard, is not whether the City's methodology has some logical basis, whether it appears fair in some general sense, or whether an expert believes it is "good enough for government work," *Brown v. Plata*, 563 U.S. 493, 562 (2011) (Scalia, J., dissenting), as the pejorative saying goes; rather, the issue is whether the City's methodology as applied to the Properties at issue produced charges to the government that meet the money-mandating requirements of the Federal-Facilities Section. In deciding that issue, this Court is mindful of the United States Supreme Court's "established practice of construing waivers of sovereign immunity narrowly" and thus we "decline [the] invitation to read the statutory language [as] broadly" and as permissively as Wilmington has urged throughout this litigation. *Lane v. Pena*, 518 U.S. 187, 195 (1996).

To be clear, the Court takes no issue with Wilmington's general approach — *i.e.*, the use of property categories and runoff coefficients. The problem, however, is that for Wilmington's charges to be found "reasonable," the City's evidence must show, at a minimum, that the County's tax records properly categorize the Properties for

---

[15] Section 1323(c)(1)(b) further requires that charges be "used to pay or reimburse the costs associated with any stormwater management program[.]" 33 U.S.C. § 1323(c)(1)(b). Wilmington has met this requirement. *See* JSUF ¶¶ 115–19; Tr. 342:14–21 (Mr. Cyre testifying that the City's stormwater charges are used to pay the cost of the stormwater program). The government also does not contest that the City's charges meet Section 1323(c)'s "nondiscriminatory" requirement. *See* Wilmington Code § 45-53(d) ("All parcels that are within the city's corporate boundaries, shall be assessed a quarterly storm water charge[.] . . . ."); ECF No. 106-1 at A13–A14, 37:21–38:5; JX 61 at 3–4 (government interrogatory response agreeing that "[t]he United States does not presently so contend" that Wilmington's stormwater charge is discriminatory).

stormwater purposes, including relative to other properties or classes of properties within the City's jurisdiction. Relatedly, Wilmington also must show that Dr. Chow's 1962 Study — from which the City's consultants derived the runoff coefficients Wilmington utilizes in its formula — assumes the same land category definitions as the County's records. As discussed in more detail below, the City failed to meet its burden of proof on those factual questions and, thus, has not properly tailored its stormwater charge program to the Federal-Facilities Section's requirements.

*First*, the City failed to offer any testimony or evidence to prove that the County's tax records properly categorize the Properties — either individually or in comparison to other properties. The tax records are critical because they drive the selection of the runoff coefficient and the resulting charges. Thus, if a particular property is classified incorrectly (*i.e.*, there is no demonstrable connection between a County classification and a property's actual runoff characteristics) — or even if other properties are classified incorrectly relative to the Properties — the resulting charges cannot represent a fair approximation of contribution to stormwater pollution. The fatal problem for the City's claim is that the County land-record tax classifications have nothing to do with stormwater runoff; instead, the County assigns land-use codes based on occupancy permits, *see supra* Section III.C, and Wilmington fails to demonstrate any ties between the labels assigned by occupancy permits and a property's actual topography, its runoff characteristics, or its contribution to stormwater pollution. *See* Wilmington Code § 45-53(a) (defining "Vacant parcel" as "a parcel upon which there is no structure except for some marginal structure such as fencing, and which is assigned a 'Vacant' occupancy code in the assessor's records of the New Castle County Department of Land Use.").

Put differently, the City makes no individualized effort to determine whether a different land category from Dr. Chow's 1962 Study might more accurately describe the characteristics of the Properties. Wilmington's system merely assumes that the County's tax records reflect land categories whose definitions mirror those described in Dr. Chow's 1962 Study, from which Black & Veatch derived the runoff coefficients the City uses. Simply put, a "vacant" parcel may be defined one way in Dr. Chow's 1962 Study but a different way in the County's tax records. If that were the case, the City may well be assigning an entirely erroneous runoff coefficient to the Properties at issue. In fact, Mr. Cyre explicitly conceded that possibility:

> [THE COURT]: How do we even know that, when [Dr. Chow's 1962 Study] uses the range of .10 to .30, that that's what the [County's] tax records are talking about in terms of the character of the land?

> [MR. CYRE]: I don't know that. I would assume that Black &
> Veatch, in allocating those . . . land use classes, those
> occupancy codes, had some basis for doing so. But I do not
> personally know that, sir.

Tr. 373:13–22. Wilmington cannot sustain its claim against the government on
Dr. Cyre's admitted assumption about Black & Veatch's work, which he made no
independent attempt to substantiate. Wilmington provided no evidence to fill that gap
in the record and, for all the Court knows, the coefficients assigned to the Properties
bear little to no relationship to the land category definitions in Dr. Chow's 1962 Study,
let alone to the reality of the Properties' physical characteristics (in terms of runoff or
pollution generation). Accordingly, the Court concludes that the coefficients may
accurately reflect the percentage of a particular property generating runoff or they may
not. That problem alone is sufficient to defeat Wilmington's claim here.[16]

*Second*, Wilmington failed to prove that the variation of the actual characteristics
of properties within a particular tax-record category is relatively small. Again, Mr. Cyre
conceded this at trial:

> [DEFENDANT'S COUNSEL]: And it's accurate to say that —
> as I believe you've testified, that you have not performed any
> analysis of the properties that comprise these three occupancy
> codes; correct[?]
>
> [MR. CYRE]: That is correct.
>
> [DEFENDANT'S COUNSEL]: And isn't it fair to say that,
> without doing any analysis of the properties that are in these
> three occupancy codes, that you cannot conclude that the

---

[16] A related problem is that the "gross parcel area" used in the City's calculations also comes
from New Castle County tax assessor's office, but the City does not verify the accuracy of that
data either. JSUF ¶ 33 ("New Castle County provides the property land use occupancy codes,
Wilmington does not check the property land use occupancy code unless an appeal is filed, and
Wilmington is not involved in New Castle County's process for setting property land use
occupancy codes."). The City does not know what land covers or property characteristics
actually exist on the Properties, Tr. 129:9–12, and it does not know if the County's data is
accurate, Tr. 132:18–20; *see also* Tr. 309:17–21 (Mr. Cyre testifying that "in the specific applied
sense, it would be productive to validate the accuracy of any data source that you are using, in
this case the . . . New Castle County database"). None of this means that Wilmington's formula
is generally unlawful or otherwise improper as applied to other properties with the City's
jurisdiction. Rather, the Court holds only that the City's charges to the United States at issue
here do not meet the requirements of the Federal-Facilities Section.

properties in that vacant class have similar land use characteristics?  That's fair; correct?

[MR. CYRE]:  I think that's fair.

Tr. 360:23–361:8.

Given that admission, Wilmington fails to demonstrate that all the properties within a particular class should be assigned the same coefficient, although that is exactly what the City's charging methodology does for the Properties.  Again, assigning all properties with a certain occupancy code the same coefficient assumes that the properties have the same (or nearly the same) runoff characteristics.  But, if there is wide variation in the actual characteristics of properties within a particular occupancy code, that could well mean that the government is being overcharged vis-à-vis other properties assigned the same code.  Absent testimony or other evidence either substantiating the degree of similarity within an occupancy code or tying the coefficients to the reality of the Properties' physical characteristics, Wilmington cannot prove that its charges are "based on some fair approximation of the proportionate contribution of the property . . . to stormwater pollution[.]"  33 U.S.C. § 1323(c)(1)(A).

Other aspects of Mr. Cyre's testimony further undermine Wilmington's case:

- Mr. Cyre did not ever examine, or even visit, the Properties.  Tr. 380:18–23; 383:21–384:7.    Nor did the City.    Tr. 116:21–24 ("[DEFENDANT'S COUNSEL]: Wilmington has never been to the dredge disposal sites to determine what is actually on the properties; right?  [COMMISSIONER WILLIAMS]:  That is correct.").  Accordingly, Mr. Cyre was unable to offer testimony about the Properties in particular.    Tr. 283:6–13; *see also* Tr. 347:25–348:3 (confirming that Mr. Cyre's "focus was not on the individual properties at issue").

- Mr. Cyre was unable to explain to what extent the City's impervious area estimate correlated with the Properties' actual impervious area.  Tr. 349:14–21; *see also* Tr. 381:10–17 ("[DEFENDANT'S COUNSEL]: To be clear, you do not offer an opinion that the .30 runoff coefficient is a fair approximation of the stormwater pollution that the Corps' properties at issue contribute to Wilmington's stormwater system; correct?  MR. CYRE: Other than by that assumed extension from the class level to the individual members of the class, that is correct.").

- Mr. Cyre admitted that it is impossible to know if the assigned runoff coefficient for a given property is accurate unless and until the City examines that property. Tr. 297:5–12.

Although the Court acknowledges that Wilmington's charges must represent only a "*fair approximation* of the proportionate contribution of the property or facility to stormwater pollution," the City's expert conceded too much ground for the City to prevail. 33 U.S.C. § 1323(c)(1)(A) (emphasis added). In that regard, the Court takes no issue with the City's contention that the Clean Water Act permits the City to assess stormwater fees against the United States based on estimates, Pl. Resp. at 29.[17] The Court concludes, however, that such estimates must be based on facts anchored in reality.

Legal questions about approximations and estimates are not unique to this case. For example, in *Precision Pine & Timber, Inc. v. United States*, the United States Court of Appeals for the Federal Circuit, our immediate appellate court, considered, "with respect to damages[,] . . . whether the evidence adduced at trial was sufficient to enable the fact finder . . . to make a 'fair and reasonable approximation.'" 596 F.3d 817, 833 (Fed. Cir. 2010) (quoting *Nat'l Australia Bank v. United States*, 452 F.3d 1321, 1327 (Fed. Cir. 2006)). The party charged with proving a fair approximation of damages "has the burden of proving them with 'reasonable certainty.'" 596 F.3d at 833. "As the phrase itself suggests, *reasonable certainty* requires more than a guess, but less than absolute exactness or mathematical precision." *Id.* (emphasis added) (citing *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001)). Based on the facts as found above, the Court concludes that, in this case — on the spectrum of proof between guess and "reasonable certainty" — Wilmington's evidence is closer to the former than the latter and, thus, the calculated fees at issue do not constitute a "fair approximation of the proportionate contribution of the property or facility to stormwater pollution." 33 U.S.C. § 1323(c)(1)(A).[18]

---

[17] Specifically, Wilmington contends that "Congress's choice of the phrase 'based on *some* fair approximation of the proportionate contribution of the property or facility to stormwater pollution' necessarily implies that more than one approximation may be fair." Pl. Resp. at 29 (quoting 33 U.S.C. § 1323(c)(1)(A)). The Court takes no issue with that specific assertion, either.

[18] *Cf. Boeing Co. v. United States*, 86 Fed. Cl. 303, 314 n.8 (2009) ("While consideration of a hypothetical negotiation 'necessarily involves an element of approximation and uncertainty,' . . . an expert should be able to hazard something more than a guess, or at least show how, despite all reasonable efforts, his estimate is the best that could be derived." (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995))).

Accordingly, the City did not prove that the Properties' estimated runoff, and thus the stormwater charges, were remotely accurate in any sense of that word.  This Court simply cannot, on this record, conclude that the City's charges were "based on some *fair approximation* of the proportionate contribution of the propert[ies] . . . to stormwater pollution."  33 U.S.C. § 1323(c)(1)(A) (emphasis added).

Wilmington's proof at trial also failed to focus on the object of the requisite "fair approximation" — *i.e.*, "the proportionate contribution of the property or facility to stormwater pollution."  33 U.S.C. § 1323(c)(1)(A).  Neither the Supreme Court nor the Federal Circuit appear to have defined "proportionate" or "proportional" for the purposes of the Clean Water Act.  Merriam-Webster defines "proportionate," not surprisingly, with reference to "proportional"; it defines "proportional" as "corresponding in size, degree, or intensity."  *Proportionate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/proportional (last visited Jan. 24, 2022).[19]  A straightforward reading of 33 U.S.C. § 1323(c) therefore indicates that stormwater charges assessed against a federal property must be tied to the property's relative (or "corresponding") contribution to stormwater pollution.  Even without resorting to a dictionary definition, however, the Court finds it obvious that the statute requires some actual relationship between charges assessed against federal properties and their relative contribution to total stormwater pollution.[20]

It is true, as Wilmington notes, that Congress appears to have adopted the 2011 Amendments "out of frustration with increasing Federal agency resistance to paying local stormwater charges."  Pl. Resp. at 21 (citing 156 Cong. Rec. H979 (Dec. 22, 2010)).  But neither the plain language of the Federal-Facilities Section nor its legislative history suggests that Congress made the government liable for anything more than stormwater pollution costs for which federal properties are proportionately responsible.  In other words, the Federal-Facilities Section only mandates that the federal government pay for its relative contribution to pollution — a connection that Wilmington did not prove at

---

[19] Merriam-Webster's definition comports with that of other dictionaries.  *See, e.g.*, *Proportionate*, Oxford Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/proportionate (last visited Jan. 25, 2022) ("increasing or decreasing in size, amount or degree according to changes in something else"); *Proportionate*, Oxford English Dictionary (3d ed. 2007), https://www.oed.com/view/Entry/152776 (last visited Jan. 25, 2021) ("[p]roportioned, adjusted in proportion; that is in (due) proportion, proportional (*to*); appropriate in respect of quantity, extent, degree, etc.").

[20] *Cf. Hospice of New Mexico, LLC v. Sebelius*, 691 F. Supp. 2d 1275, 1291 (D.N.M. 2010) (concluding that "[t]he word 'proportion,' within the context of 42 U.S.C. § 1395f(i)(2)(C), refers to the mathematical relation of a part to the whole; in other words, it specifies a ratio or a fraction"), *aff'd*, 435 F. App'x 749 (10th Cir. 2011).

trial.  The fact that Congress was concerned with the United States paying for its fair share of stormwater runoff does not mean that Congress commanded payment for just any reasonable guesstimate of costs that a locality seeks to impose on property owners within a jurisdiction.  Rather, the government is on the hook for fees correlating with the approximate stormwater pollution to which the government actually contributes (with the caveat that, as the Court already has acknowledged, such contributions may be reasonably estimated).[21]

In sum, the statutory phrase "proportionate contribution of the property or facility to stormwater pollution" requires some link between the charges Wilmington seeks to impose and a property's (estimated) stormwater pollution relative to total pollution.  Charges without such a link cannot be reasonable under the statute.  For example, the total cost of the City's stormwater management system cannot simply be allocated over a base of property area because the quantity of attributable pollution cannot be derived from the size of a property alone.  In that regard, the City acknowledges, at least implicitly, that the specific physical characteristics of a property must be taken into account.  As explained above, the City relies upon County tax records and runoff coefficients to accomplish that, but despite the statute's plain language, Wilmington did not present any evidence linking the Properties to any particular amount of stormwater pollution, proportional or otherwise, and there is no evidence that the proxies for relative pollution contribution — tax record categories and runoff coefficients — yield a fair approximation for the purpose of computing a charge.

In its response brief, Wilmington elaborates on its interpretation of the Federal-Facilities Section, arguing that the City's charge regime keeps proportionality "within a given Nonresidential class using parcel area," "between Nonresidential classes using impervious area," and across different classes.  Pl. Resp. at 30.  This interpretation of proportionality is not what the statute demands; rather, the statute demands a demonstrated relationship between the charges and the Properties' relative stormwater

---

[21] This Court generally is less than enthusiastic about relying on legislative history, and that is particularly true where the statutory language is relatively clear and the history in question is comprised of statements from individual legislators.  *United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("[G]iven the straightforward statutory command, there is no reason to resort to legislative history."); *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. --, 137 S. Ct. 929, 943 (2017) ("floor statements by individual legislators rank among the least illuminating forms of legislative history").  Nevertheless, because both parties cite to the legislative history in their briefs — see Def. Mot. at 18–19, 22, 25–26, 28, 31, 34, 41–42; Pl. Resp. at 18–21, 29, 35 — the Court has reviewed it and concludes that the legislative history, if anything, corroborates the straightforward textual reading the Court applies in this decision.

pollution (even if that quantity is estimated).[22]  This can be seen from the language of the statute itself, which implicitly requires that a property's "contribution . . . to stormwater pollution" be assessed "in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility."  33 U.S.C. § 1323(c)(1)(A).  As a result of the City's erroneous statutory interpretation,[23] however, the City did not provide evidence that it calculated charges for the Properties based on the Properties' relative contribution to the City's stormwater pollution.

Nor for that matter, as explained *supra*, does the Court accept Wilmington's contention that its charging scheme results in proportionate charges across different classes for the simple reason that Wilmington estimates impervious area for all nonresidential properties using a runoff coefficient approach but does not use runoff coefficients to determine impervious area for residential parcels.  Tr. 122:2–9.

### B.  Wilmington Attempted to Prove the General Reasonableness of Its Service Charge Methodology, Which Is Insufficient for Recovery

Wilmington focused its entire case-in-chief on proving that the methodology the City uses to calculate stormwater charges for all properties in the City — residential, commercial, and Federal — is generally reasonable.  This strategic choice at trial meant Wilmington did not provide evidence of the Properties' proportionate contribution to pollution, either estimated or actual.  Given that choice, Wilmington's case may have been doomed from the outset, given how the Court reads the statute (as explained above).  Nonetheless, some discussion of the City's case-in-chief is warranted to

---

[22] The City confirmed at trial that it would not label as unreasonable any gap, no matter how large, between a property's actual impervious area and its estimated impervious area unless the government followed the City's appeal process to dispute the City's estimate.  Tr. 193:13–19.  The implications of this position are striking; unless the government files an appeal, a monumental difference between actual and correct charges — say, one leading to a million-dollar overcharge — would not be considered unreasonable under Wilmington's approach.

[23] Wilmington also presented differing interpretations of the proportionality requirement during its case-in-chief.  *Compare* Tr. 236:9–24 ("[DEFENDANT'S COUNSEL]: So[,] it's your testimony that a class with totally different, you know, properties in it, with totally different characteristics, the resulting charge would still be proportional?  [COMMISSIONER WILLIAMS]: Yeah.  I believe — I believe that the system is a fair approximation of it.  Yes."), *with* Wilmington Code § 45-53(a) ("Storm water class means classes of uses defined such that customers within a class have similar land use characteristics"); *see also* Def. Mot. at 25 n.7 (citing Commissioner Williams' testimony at Tr. 236:19–25 as proof that "Wilmington fundamentally misunderstands the proportionality requirement").

demonstrate the gap between what the City showed and what it needed to show to recover.[24]

The thrust of the City's evidence was that:  (1) Wilmington's system is, overall, "reasonable . . . [and] nondiscriminatory in technical terms"; (2) its charges, generally, are "based on an approximation of the proportional contribution of . . . *all* the properties . . . to stormwater pollution"; and (3) by extension, the charges at issue must be characterized as reasonable.  Tr. 342:22–343:5 (emphasis added).  To this end, the City's sole expert witness, Mr. Cyre, testified as to various apparently sensible aspects of the City's charge regime.  For example, he testified that the impervious area — the proxy the City uses to help estimate how much water runs off a property — provides "one fair approximation of the contribution to stormwater pollution."  Tr. 302:25–303:3. He testified that more than three quarters of methodologies in use today by localities incorporate impervious surface area in some manner, and that impervious area "is widely accepted as the parameter that best represents contribution to pollution."  Tr. 303:10–20; *see also* JX 14 at WILM0000446 (discussing the widespread use of impervious area in stormwater rate setting).

Mr. Cyre defended various aspects of the City's methodology.  He testified, for example, that the County's tax databases — upon which the City relies to determine a property's gross area — "are generally among the best in terms of reflecting what is real."  Tr. 309:12–25.  Regarding the City's use of coefficients to determine impervious area, Mr. Cyre testified that Dr. Chow's "hydrology coefficients of runoff," upon which the City bases its own runoff coefficients, are "accepted by the engineering and hydrology fraternity totally."  Tr. 337:13–15.  Mr. Cyre further testified that he "think[s] Wilmington's system is achieving the appropriate objectives," citing the use of classes for properties and based upon *the assumption* that the County's tax database is "good." Tr. 336:20–337:12.  He testified that the system "treats similar classes of properties similarly and dissimilar classes of properties proportionately."  Tr. 337:3–5.  He testified that from a technical standard, the "stormwater charges *to the classes* of properties in Wilmington bear a substantial relationship to the cost of the stormwater management program," Tr. 337:16–22 (emphasis added), and that the system as a whole is "approximately and reasonably proportional to the cost of the program," Tr. 338:1–10.

---

[24] "Reasonable" has been defined as "fair, proper, or moderate under the circumstances[.]" *Ayesta v. Davis*, 584 U.S. --, 138 S. Ct. 1080, 1093 (2018) (citing *Reasonable*, Black's Law Dictionary (5th ed. 1979)).  The 2019 edition of Black's Law Dictionary defines the term identically.

All this testimony is beside the point.  Wilmington's evidence may show that its stormwater charge methodology is reasonable in some general sense.[25]  But the Clean Water Act does not require the government to pay service charges merely because a locality employs a methodology that may be generally characterized as reasonable or because a locality's methodology is similar to others adopted in different jurisdictions.  Rather, the statute provides that the federal government must pay charges only if they are "based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution."  33 U.S.C. § 1323(c)(1)(A).  Mr. Cyre did not opine, other than in a conclusory fashion, on how Wilmington's methodology meets the statutory requirements.  Indeed, Mr. Cyre admitted that both of the following can be simultaneously true — the City's stormwater methodology could be "within a reasonable spectrum of approaches" and yet the charges that system produces for the Properties at issue might "not accurately reflect the demand [the] Corps' Properties place on the system."  Tr. 378:22–379:4.  Relatedly, he also indicated that the City's use of runoff coefficients to estimate impervious area can be consistent with general industry practice, while the City's application of a particular runoff coefficient to the Properties might "not accurately reflect the[ir] impervious area." Tr. 378:14–21.  Those admissions fundamentally undermine Wilmington's case.

The Court further finds it impossible to determine that the Properties' charges are "based on a proportionate contribution . . . to stormwater pollution" absent a preponderance of evidence that the Properties impose any burdens on, or contribute any pollution to, Wilmington's stormwater management system.  33 U.S.C. § 1323(c)(1)(A).  In particular, Wilmington failed to identify *any* measurable cost the Properties impose on the City's stormwater management system.  *See, e.g.*, JSUF ¶ 14 ("Wilmington does not contend that stormwater from one or more Properties entered (or is entering) Wilmington's [combined sewer system] and [municipal separate storm sewer system].");  JSUF ¶ 15 ("The Properties do not contribute to Combined Sewer Overflows[.]").  Wilmington's trial witnesses made this clear.  Mr. Cyre did not render an opinion on whether the Properties "imposed *any* additional costs on Wilmington's system or program."  Tr. 291:12–292:7 (emphasis added).  Specifically, Mr. Cyre admitted that he was unaware of:  (1) any City analysis regarding the demand the Properties impose on Wilmington's system, Tr. 393:6–10; (2) any drainage infrastructure the City provides to service the Properties, Tr. 393:15–18; or (3) any infrastructure to

---

[25] On the other hand, even that may be a rosy assessment of Wilmington's evidence:  Mr. Cyre went on to testify that he would put Wilmington's methodology "at the 45[th] percentile," adding "it's pretty darn good. . . . I think it could be a lot better. . . . I think it's good enough." Tr. 307:21–308:3.  Accordingly, the Court does not conclude that Wilmington's methodology is generally reasonable; rather, the Court merely assumes it is for the purposes of this decision.

improve water quality that the City maintains as a result of the Properties. Tr. 393:19–22.

Similarly, Commissioner Williams testified that the Properties do not contribute water to any of Wilmington's pipes, its combined sewer system, the municipal separate storm sewer system, combined sewer overflows, or the wastewater treatment plant. Tr. 177:14-18 (pipes); Tr. 176:21-25, (combined sewer system); Tr. 177:1–5 (municipal separate storm sewer system); 179:6–9 (combined sewer overflows); Tr. 178:4–20 (wastewater treatment plant). She also testified that the City is unaware of any pipes on the Properties "that connect to [Wilmington's] stormwater collection and conveyance system." Tr. 145:8-13. Finally, Commissioner Williams testified that the City does not know the proportional demand or burden, if any, that the Properties place on the rivers or to which TMDLs the dredge disposal sites contribute. Tr. 185:13–23, 186:23–187:3 (rivers); Tr. 189:17–21 (TMDLs).

In sum, Wilmington's reliance on Mr. Cyre's and Commissioner Williams' testimony to prove that the Properties contribute to stormwater pollution (and associated costs) — and were charged accordingly — is unavailing, particularly given the City's burden of proof in this case.

\* \* \* \*

In the end, Wilmington concentrated its fire away from the correct statutory target (as delineated in the Federal-Facilities Section), failed to produce evidence demonstrating proportionality, and, thus, failed to meet its burden to prove facts necessary to show that it is entitled to the claimed fees.

## C. The Court Rejects Wilmington's Remaining Arguments

Wilmington advances several alternative arguments in an attempt to show that its charges qualify as reasonable under the Federal-Facilities Section. None of them succeeds.

### 1. The 2008 EPA Brochure Is Irrelevant

Wilmington insists that the EPA's inclusion of Wilmington's stormwater utility in a 2008 brochure, in which the EPA labeled the program "fair and equitable," imbues Wilmington's charges with *per se* reasonableness under the Clean Water Act. ECF No. 112-3 at 5; Pl. Resp. at 22–23 ("The EPA's conclusion has not been withdrawn or rebutted."). The brochure certainly favors Wilmington's position, but cannot save the City's claims. The EPA's label of "fair and equitable" is irrelevant as a matter of both fact and law.

First, even if an agency's description of a charging methodology in a public publication was somehow meant as a binding factual admission — something that Wilmington does not argue here — EPA could not have used the phrase to refer to Section 1323(c)(1) because the 2008 brochure was published well before the 2011 Clean Water Act Amendments.  *See* Pl. Resp. at 23 ("[T]he EPA's description of Wilmington's stormwater charges as being 'fair and reasonable' predates Congress' 2011 amendment to 33 U.S.C. § 1323 . . . .").  Thus, the EPA's brochure cannot show, as a factual matter, that the government intended (in 2008) for Wilmington's charges to be deemed reasonable under the definition of "reasonable service charges" enacted years later.

Second, while a charitable interpretation of the City's argument may be that EPA's praise for Wilmington's program somehow should preclude the government from refusing to pay Wilmington's charges based on an estoppel theory, binding precedent forecloses such an argument here.  In general, a plaintiff cannot rely upon erroneous advice from government personnel to obtain payment where it is otherwise unauthorized.  *See, e.g.*, *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 426 (1990) ("[J]udicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized.").[26]  Thus, even if Wilmington invokes the EPA brochure as the basis for some sort of an estoppel argument, the Court rejects it.

### 2.  Industry Practice Is Inapposite to the Statutory Requirements

Wilmington further argues that its charges are reasonable because its engineering firm developed the City's approach to be consistent with industry practice.  Pl. Resp. at 23 ("The fact that Wilmington's Ordinance assesses stormwater charges consistent with prevailing standards and practices is itself evidence of the charges' reasonableness.").  The Court is not unsympathetic to the City's point in a general sense, but it is inapposite to the statutory requirements.  Nothing in the statute makes Wilmington's charges

---

[26] This is particularly true in the absence of any allegation of affirmative misconduct — something Wilmington does *not* allege here.  *See Lua v. United States*, 843 F.3d 950, 956 (Fed. Cir. 2016) ("Appellants must show 'affirmative misconduct [as] a prerequisite for invoking equitable estoppel against the [G]overnment'" (quoting *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed. Cir. 2000))).  Wilmington alleges only that the EPA "reviewed Wilmington's stormwater utility . . . and concluded . . . that Wilmington had 'establish[ed] a stormwater utility to recover costs related to stormwater management on a *fair and equitable* basis.'"  Pl. Resp. at 22–23 (quoting PX 28 at 4).  It does not allege affirmative misconduct and nowhere claims that Wilmington developed its stormwater utility in reliance on EPA's brochure.  In any event, the Court doubts that such allegations would make sense, as the EPA's brochure was published after Wilmington's stormwater utility provisions were enacted.  PX 28 at 4 ("Wilmington has a combined sewer system and used a three-step approach to establish a stormwater utility . . . .").

reasonable for payment purposes just because the City's approach is similar to that of other localities.

Moreover, even if the Court were to assume that the City's process followed the industry standard at the time the ordinance was passed,[27] a practice that fails to satisfy a current legal requirement for payment cannot be saved by conformance with a years-old industry standard.[28]  Rather, to recover its charges in this case, Wilmington must, but does not, demonstrate that its charges properly qualify under the money-mandating statute at issue, 33 U.S.C. § 1323.

### 3.  The Charges Do Not Have a "Presumption of Reasonableness"

Wilmington further argues that its stormwater charges must be presumed reasonable as a matter of law.  Pl. Resp. 24–27.  Specifically, the City argues that because its stormwater charges were "assessed in strict accordance with the elements of City Code § 45-53" they are "presumed reasonable as a matter of law" and are subject only to "rational basis" review.  *Id.* at 24.  Wilmington thus seems to argue that virtually any charges it develops under its own Code would be legally reasonable under the Clean Water Act, without regard to the statutory definition of "reasonable service charges" contained in the Federal-Facilities Section.  This is patently incorrect.  Because 33 U.S.C. § 1323(c) clearly defines when state and local charges are "reasonable," this Court may not presume that Wilmington's charges are "reasonable as a matter of law."  Wilmington, as the plaintiff in this action, bears the burden of proof and cannot shift that burden to the government.  *See, e.g.*, *Banks v. United States*, 78 Fed. Cl. 603, 616 (2007) (noting that "[p]laintiffs bear the burden of proof in civil proceedings" and they "meet that burden only if they establish by a preponderance of the evidence the cause of action for which they have sued" (internal quotations and citations omitted)), *vacated in part on other grounds*, 721 F. App'x 928 (Fed. Cir. 2017).

---

[27] The government disputes this claim, labeling the testimony of Wilmington's expert on the matter conclusory:  "There is no evidence in the record that 'the practices [of] Black and Veatch' in formulating Wilmington's utility are consistent with industry standards. . . . There is no evidence before the Court that Wilmington's ordinance is consistent with prevailing standards." Def. Reply at 6 (quoting Pl. Resp. at 23).

[28] Congress amended the Federal-Facilities Section to define "reasonable service charges" in 2011, after Wilmington already instituted the formula it used to generate the charges for which it seeks compensation here; it is perhaps unsurprising that Wilmington ultimately fails to demonstrate that its charges to the government qualify under the relevant statute because Wilmington never updated its charging methodology accordingly.  Tr. 106:18–107:9.

Relatedly, the City contends that the Clean Water Act "did not exempt the United States from the burdens of overcoming . . . long-established presumptions accompanying local ordinances" like Wilmington's "complete powers of legislation and administration" and its "power to enact ordinances . . . necessary and proper for carrying into execution of any of its express or implied powers."  Pl. Resp. at 26–27 (quoting Wilmington Code § 1-101 ("Powers of the city — Generally")).  This argument also fails.  The government does not challenge the City's general power to enact ordinances, nor does the government contest the validity of Wilmington's statutory scheme for stormwater charges.  Rather, the only issue here is whether the City has proven that the government must pay assessed charges pursuant to the Federal-Facilities Section of the Clean Water Act.  The City's power to enact ordinances is simply irrelevant to that question, which the Court answers in the negative.

### 4.   The Supreme Court's "*Massachusetts* Test" is Inapplicable

Next, Wilmington argues that the Supreme Court's decision in *Massachusetts v. United States*, 435 U.S. 444 (1978), and its progeny, should control the outcome of this case.  According to Wilmington, those cases teach that the City only has to demonstrate that its charging methodology is "generally reasonable" because:  (1) "the words 'accurate' or 'actual' are not found in 33 U.S.C. § 1323"; and (2) "the law has never held [local] governments to any semblance of accuracy under the 'fair approximation' test or otherwise."  Pl. Resp. at 32–33 (discussing *Massachusetts* and citing other cases).  The Court is unconvinced that *Massachusetts* rescues the City's claims.

In *Massachusetts*, the Supreme Court considered an annual registration tax Congress imposed on all civil aircraft that fly in the navigable airspace of the United States; the tax was enacted "[a]s part of a comprehensive program to recoup the costs of federal aviation programs from those who use the national airsystem."  435 U.S. at 446.  The case involved the "*constitutional* question" of "whether this tax, as applied to an aircraft owned by a State and used by it exclusively for police functions, violates the implied immunity of a state government from federal taxation."  *Id.* (emphasis added).  The Supreme Court concluded "that it does not."  *Id.*  In so holding, the Supreme Court explained:

> The principles that have animated the development of the doctrine of state tax immunity and the decisions of this Court in analogous contexts persuade us that a State enjoys no constitutional immunity from a nondiscriminatory revenue measure, . . . which operates only to ensure that each member of a class of special beneficiaries of a federal program pay a

>reasonable approximation of its fair share of the cost of the
>program to the National Government.

*Id.* at 454–55 (noting that "the immunity of the Federal Government from state taxation is bottomed on the Supremacy Clause, but the States' immunity from federal taxes was judicially implied from the States' role in the constitutional scheme").

In sum, the Supreme Court held:

>So long as the [federal] charges do not discriminate against
>state functions, *are based on a fair approximation of use of the*
>*system*, and are structured to produce revenues that will not
>exceed the total cost to the Federal Government of the benefits
>to be supplied, there can be no substantial basis for a claim
>that the National Government will be using its taxing powers
>to control, unduly interfere with, or destroy a State's ability to
>perform essential services.

*Massachusetts*, 435 U.S. at 466–67 (emphasis added).

This Court understands the facial appeal of the *Massachusetts* decision to Wilmington's position. The Supreme Court in that case indeed acknowledged that a "fair approximation" of a user's proportional share of the cost of a system does not require a precise calculation. 435 U.S. at 465–66 (discussing the general insignificance of "[t]he possibility of a slight overcharge"). The government does not dispute that premise. Def. Resp. at 9 (conceding that the Clean Water Act's Federal-Facilities Section "does not require exact precision"). And neither does this Court. But that premise does *not* lead to the ineluctable conclusion that the reasoning in *Massachusetts* applies here to save Wilmington's money-mandating claim. In that regard, we must be clear about the context of that case and the precise issue before the Supreme Court — *Massachusetts* did not define the term "fair approximation" for all purposes, but rather addressed whether fees the federal government imposed on a state passed constitutional muster:

>If the National Government were required more precisely to
>calibrate the amount of the fee to the extent of the actual use
>of the airways, administrative costs would increase and so
>would the amount of revenue needed to operate the system.
>The resulting increment in a State's actual fair share might
>well be greater than any overcharge resulting from the
>present fee system. But the complete answer to the
>Commonwealth's concern is that even if the flat fee does cost
>it somewhat more than it would have to pay under a perfect

> user fee system, there is still no interference with the values
> protected by the implied constitutional tax immunity of the
> States. The possibility of a slight overcharge is no more
> offensive to the constitutional structure than is the increase in
> the cost of essential operations that results either from the fact
> that those who deal with the State may be required to pay
> nondiscriminatory taxes on the money they receive or from
> the fact a jury may award an eminent domain claimant an
> amount in excess of what would be "just compensation" in an
> ideal system of justice.

*Massachusetts*, 435 U.S. at 466.

The Supreme Court thus held that a tax representing a "fair approximation" of "use" — or perhaps, more accurately, an allocation of cost of use — satisfied constitutional requirements. 435 U.S. at 461 ("A nondiscriminatory taxing measure that operates to defray the cost of a federal program by recovering a fair approximation of each beneficiary's share of the cost is surely no more offensive to the constitutional scheme than is either a tax on the income earned by state employees or a tax on a State's sale of bottled water."). Applying that "fair approximation" standard to the tax at issue, the Court in *Massachusetts* concluded that it was constitutional: "the tax satisfies the requirement that it be a fair approximation of the cost of the benefits civil aircraft receive from the federal activities." *Id.* at 467. Although the Court noted "[a] probable deficiency in the formula" — insofar as "not all aircraft make equal use of the federal navigational facilities or of the airports that have been planned or constructed with federal assistance" — the Court nevertheless determined the taxation "scheme . . . is a fair approximation of the cost of the benefits each aircraft receives." *Id.* at 468–69 ("The four taxes, taken together, fairly reflect the benefits received, since three are geared directly to use, whereas the fourth, the aircraft registration tax, is designed to give weight to factors affecting the level of use of the navigational facilities."). The Supreme Court further determined that "the tax is not excessive in relation to the cost of the Government benefits supplied." *Id.* at 469.

Although this Court agrees with Wilmington that *Massachusetts* plausibly may be read to operationally define the phrase "fair approximation," we cannot graft that concept from a case involving the constitutionality of a tax onto the later-enacted, money-mandating statute at issue in this litigation. To the extent the Supreme Court defined "fair approximation," the definition is hardly plug-and-play. In that regard, the United States Court of Appeals for the Eighth Circuit explained the difficulty with exporting the *Massachusetts* analysis to a different context:

> As far back as the landmark case of *McCulloch v. Maryland*, 4
> Wheat. 316, 4 L.Ed. 579 (1819), it was recognized that the
> federal government is immune from taxation by the states

> absent Congressional authorization.  Federal immunity from state taxation is based on the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2.  Unlike the states' immunity from federal taxation, which is somewhat limited, the United States' immunity from state taxation is a "blanket immunity." . . . The immunity question in *Massachusetts* arose in the context of a state's immunity from federal taxation.  The states' immunity from federal taxation is more limited than the federal government's immunity from state taxation, and is based on a different constitutional source.  Generally, the states are immune from federal taxation that would unduly burden essential state functions.  Federal immunity from state taxation, however, is a blanket immunity and is not subject to the same limits.

*United States v. City of Columbia*, 914 F.2d 151, 153–54 (8th Cir. 1990) (internal citations omitted) (quoting *South Carolina v. Baker,* 485 U.S. 505, 518 n.11 (1988), and discussing *Massachusetts,* 435 U.S. at 459–60).  Thus, there is a distinction this Court must draw — at least as a matter of constitutional law — between the degree of precision that the federal government must use when imposing a tax or fee on states, on the one hand, and the severe constraints upon states seeking to charge the federal government, on the other.

Wilmington fails to explain how the constitutional principles controlling what the federal government may charge users for its services translate to how this Court must interpret 33 U.S.C. § 1323(c).[29]  Again, the Supreme Court in *Massachusetts* was concerned with whether a federal tax or user fee constituted a "fair approximation" of the cost of benefits received by a user of a government program or system — a judicially-created test formulated specifically to analyze the constitutionality of a federal tax (or fee).  Indeed, the Supreme Court itself has read *Massachusetts* as standing only for the proposition that "the amount of a user fee [need not] be precisely calibrated to the use that a party makes of Government services."  *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989) ("Nor does the Government need to record invoices and billable hours to justify the cost of its services.").  Rather, "[a]ll that [is] required is that the user fee be

---

[29] *Cf. United States v. Sperry Corp.*, 493 U.S. 52, 61 n.7 (1989) (distinguishing *American Trucking Assns, Inc. v. Scheiner*, 483 U.S. 266 (1987), on the grounds that "[t]he Court there was faced with particular constitutional restrictions on fees and taxes not present in this case" and explaining that *American Trucking*'s reasoning "cannot be extended outside the context of the Commerce Clause" which imposes a more "exacting requirement" than the Just Compensation Clause).

a 'fair approximation of the cost of benefits supplied.'" *Id.* (quoting *Massachusetts*, 435 U.S. at 463 n.19).[30]

In contrast to the constitutional questions addressed in *Massachusetts*, this Court is faced with a clear statutory directive — and we cannot simply ignore the object of the "fair approximation" in the Clean Water Act's Federal-Facilities Section, in which Congress expressly commanded payment of local service charges only where they are based on "the proportionate contribution of the property . . . to stormwater pollution." 33 U.S.C. § 1323(c)(1)(A). As discussed above, Wilmington's charging methodology is entirely untethered to the Properties' proportionate contribution to stormwater pollution. Again, the City is free to estimate the Properties' proportionate contribution to stormwater pollution (*i.e.*, to employ a "fair approximation"), but there is little, if any, evidence — and certainly no preponderant evidence — that Wilmington's scheme does that with *any* degree of accuracy.

Indeed, the Court agrees with the government that Wilmington would lose even if the Court were to apply the *Massachusetts* test. *See* Def. Reply at 10. As the government notes, "*Massachusetts* requires charges be based on some fair approximation of use" or cost of use. *Id.* (citing *Massachusetts*, 435 U.S. at 464). Wilmington, however, "did not present any evidence at all showing that the Properties use Wilmington's system or impose any measurable burden on Wilmington's system," and the Properties "indisputably do not use Wilmington's local drainage infrastructure." Def. Reply at 10 (citing JSUF ¶ 14 and explaining that "[t]o the contrary, the evidence strongly shows the opposite, that the Properties are not being charged an approximate amount proportionate to their contributions to stormwater pollution").[31]

Wilmington cites other cases applying *Massachusetts*, but they are inapposite or support the government. *See* Pl. Resp. at 33 (citing, *e.g.*, *Jorling v. Dep't of Energy*, 218

---

[30] The Supreme Court thus "recognized that when the *Federal Government* applies user charges to a large number of parties, it probably will charge a user more or less than it would under a perfect user-fee system, but we declined to impose a requirement that the Government 'give weight to every factor affecting appropriate compensation for airport and airway use[.]'" *Sperry*, 493 U.S. at 61 (emphasis added) (citing *Massachusetts*, 435 U.S. at 468).

[31] The Court further agrees with the government that Wilmington also appears to "equate[] 'proportionate' with 'nondiscriminatory,' arguing that proportionate simply means fair and equitable apportionment between different governments." Def. Rep. at 10 (citing Pl. Resp. at 34). The government correctly explains, however, that "[S]ection 1323(c) *separately* requires stormwater charges be nondiscriminatory" and that "[i]f Wilmington were right, there would be no need to separately require proportionality if 'nondiscriminatory' and 'proportionate' denoted the same meaning." *Id.* Thus, the Court agrees that "Wilmington's interpretation renders the word 'proportionate' superfluous" and "must be rejected." *Id.*

F.3d 96 (2d Cir. 2000), and *Brock v. Wash. Metro Area Transit Auth.*, 796 F.2d 481, 485 (D.C. Cir. 1986)).[32]

In *Jorling*, the United States Court of Appeals for the Second Circuit held that hazardous waste charges New York State imposed on federal installations under the Resource Conservation and Recovery Act ("RCRA") constituted "reasonable service charges" pursuant to 42 U.S.C. § 6961(a) because they met the *Massachusetts* "fair approximation" test.  218 F.3d at 103–06.  In particular, the Second Circuit concluded that such charges were "reasonably designed to fairly approximate [the] use of [the New York State Department of Environmental Conservation]'s services and thereby to roughly approximate the cost of supplying these services to transporters of waste[.]"  *Id.* at 105.  As explained above, this Court does not agree that *Massachusetts*' constitutional concerns — and its "fair approximation" standard — may be transported and applied directly to the Clean Water Act's Federal-Facilities Section.  More significantly, however, *Jorling* is distinguishable because RCRA does not contain the same (or even an analogous) definition of "reasonable service charges."  *Compare* 42 U.S.C. § 6961(a), *with* 33 U.S.C. § 1323(c)(1).

As amended, RCRA provides that each department, agency, and instrumentality of the federal government

> engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural . . . , respecting control and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of *reasonable service charges.*

42 U.S.C. § 6961(a) (emphasis added).  "In 1992, Congress clarified the scope of the waiver of sovereign immunity in this provision," *Jorling*, 218 F.3d at 100, by adding the following language:

> The United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any such substantive or procedural requirement (including, but not limited to, any . . . reasonable service charge).  The reasonable service charges referred to in this subsection

---

[32] Plaintiff also cites *N.Y. Dep't of Env't Conservation v. U.S. Dep't of Energy*, 850 F. Supp. 132, 142–43 (N.D.N.Y. 1994), but that decision was affirmed in *Jorling* and so this Court does not separately address the district court decision.

> include, but are not limited to, fees or charges assessed in connection with the processing and issuance of permits, renewal of permits, amendments to permits, review of plans, studies, and other documents, and inspection and monitoring of facilities, as well as any other nondiscriminatory charges that are assessed in connection with a Federal, State, interstate, or local solid waste or hazardous waste regulatory program.

Federal Facility Compliance Act of 1992, Pub. L. No. 102–386, § 102(a)(3), 106 Stat. 1505, 1505 (codified at 42 U.S.C. § 6961(a)).

RCRA thus manifestly does not define "reasonable services charges" *per se*; it merely provides examples of what the federal government may be charged in the limited context of waste disposal.  While RCRA references the permissibility of "other nondiscriminatory charges," RCRA contains nothing similar to the limiting language of proportionality of contribution to pollution that Congress included in the Clean Water Act's Federal-Facilities Section.  The absence of such specific language at least enables this Court to understand why, for the purposes of RCRA, the parties and the Second Circuit resorted to the *Massachusetts* analysis regarding what constitutes a fair approximation *of use*.  *See Jorling*, 218 F.3d at 102 ("The Supreme Court's application of the fair approximation test in *Massachusetts* to uphold the challenged aircraft registration tax appears to tilt the analysis toward consideration of use.").[33]  Congress has instructed, however, that the "fair approximation" that is relevant for the Clean Water Act is not some generic "use" given over to judicial definition, but rather must be an approximation of "the proportionate contribution of the property . . . to stormwater pollution."  33 U.S.C. § 1323(c)(1)(A).  Because Wilmington's claims are governed by more clearly defined, and more restrictive, statutory language than that of RCRA, the Second Circuit's reliance on the *Massachusetts* analysis of "fair approximation" does not persuade this Court to apply *Massachusetts* in this case.

In *Brock v. Washington Metro Area Transit Authority*, the United States Court of Appeals for the District of Columbia Circuit considered the District of Columbia's workers' compensation regime, pursuant to which "all employers (or their compensation carriers) contribute to a Special Fund from which the Secretary of Labor . . . makes a variety of payments to injured workers."  796 F.2d at 481–82 (citing 33 U.S.C. § 944).  The Washington Metropolitan Area Transit Authority ("WMATA") stopped contributing to that Special Fund, asserting, among other things, "that the

---

[33] *See also Jorling*, 218 F.3d at 103 ("Ultimately, of course, the *Massachusetts* test is concerned with whether the challenged method for imposing charges fairly apportions the cost of providing a service, but by framing the second component of the test in terms of 'use,' the Court made clear that a method for imposing charges based on each payer's approximate use will pass muster as an adequate apportionment of costs.").

constitutional doctrine of intergovernmental tax immunity (here, state immunity from federal taxation) shelters it from liability for Special Fund contributions." *Id.* at 482.

Applying *Massachusetts*, the D.C. Circuit explained as follows:

> . . . *Massachusetts* held only that the method used to calculate the fee must rationally be designed to approximate prospectively the benefit to the user. The levy held constitutional in *Massachusetts* illustrates this meaning of "fair approximation." The fee was a flat registration tax for all civil aircraft, introduced to help finance federal aviation programs; the amount of the fee was based on the size and type of aircraft, but not the aircraft's actual use of the airways or the facilities and services supplied by the United States. . . .

> The *Massachusetts* opinion acknowledged that a fee based on actual use would measure the benefit to the user more accurately. The Court emphasized, however, that an actual use measurement method would be more costly to administer. Furthermore, the Court observed, the measurement method employed does bear a fair relationship to the benefit: bigger planes are more expensive for the federal safety system to accommodate. Finally, the Court noted that all users receive certain ambient or indirect benefits from the federal aviation system: the federal services are available to, and make the airspace safer for, all users.

*Brock*, 796 F.2d at 485–86 (discussing *Massachusetts*, 435 U.S. at 468–69, 451 n.9).

Like *Jorling*, the *Brock* decision similarly relied upon *Massachusetts* to focus on whether a fee had some approximate or fair relationship to the benefit received by the entity charged. But, again, in *Brock* — just as in *Massachusetts* itself — there was no statutory command defining the *object* of "fair approximation," in contrast to the Clean Water Act's Federal-Facilities Section at issue here. Rather, the D.C. Circuit adapted and applied the *Massachusetts* analysis to hold "that the payments in question entail a fair approximation of projected benefits, and, moreover, relate to a 'proprietary' function," such "that WMATA cannot tenably claim constitutional immunity from the Special Fund assessment." *Brock*, 796 F.2d at 487.

*Brock* is thus inapposite to Wilmington's claim, insofar as (1) constitutional immunity is not at issue in this case, and (2) the federal government's general "use" of the City's stormwater management program is not the relevant consideration (for

which there is no evidence in any event).  Rather, the issue here is whether the City's fees are "based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility)."  33 U.S.C. § 1323(c)(1)(A).  As explained above, Wilmington's assessed fees — for which it seeks a judgment here — are not based on some fair approximation of the government's proportionate contribution to stormwater pollution.

If anything, *Brock*'s explanation of *Massachusetts* demonstrates the problems with Wilmington's methodology, at least vis-à-vis its money-mandating claim in this case. As noted above, the D.C. Circuit in *Brock* highlighted that "the measurement method employed" in *Massachusetts* "does bear a fair relationship to the benefit: bigger planes are more expensive for the federal safety system to accommodate." 796 F.2d at 485–86 (noting that, in *Massachusetts*, "the amount of the fee was based on the size and type of aircraft, but not the aircraft's actual use of the airways or the facilities and services supplied by the United States").  In contrast, Wilmington presented *no* evidence explaining the relationship between the size and nature of the Properties and their proportionate contribution to stormwater pollution — and that is precisely the type of evidence the Federal-Facilities Section requires in order for the government to be on the hook for the service charges at issue.  Viewed through the prism of *Massachusetts*, Wilmington's service charges would be akin to the government charging fees based not on the verified size and type of aircraft, but rather on a mere listing of aircraft, imported from a third party without verification, that may or may not accurately reflect the aspects of the aircraft generating the charges.  This Court cannot find such charges payable pursuant to 33 U.S.C. § 1323.

### D.  The City's Fee Adjustment Process Does Not Qualify as a "Local Requirement" for Purposes of 33 U.S.C. § 1323(a)

Since the outset of this case, Wilmington repeatedly has argued that the government cannot contest the City's stormwater charges because the government did not challenge the charges through the City's appeal process.  The Court consistently has rejected that argument.  *See Wilmington I*, 136 Fed. Cl. at 631–33 (rejecting Wilmington's arguments that (1) Section 1323(a) compels the government to file an appeal, and (2) the exhaustion doctrine prevents the government from raising in litigation any arguments it could have raised in that administrative appeal); *Wilmington II*, 152 Fed. Cl. at 379–80 (rejecting Wilmington's argument that the government should be precluded from arguing at trial that the Properties contain wetlands because the government never sought lower stormwater charges through the City's appeal process). At trial, Wilmington nevertheless continued to assert that its charges must be presumed reasonable because the government did not file a fee adjustment application. Tr. 193:8–

12.  In its response brief, Wilmington once again advances the same position, with equally unpersuasive arguments. Pl. Resp. at 38–42.

As this Court already has explained, Wilmington's permissive administrative appeal process, which allows property owners to appeal only future charges — and only after all assessed fees, no matter how unreasonable, have been paid to the City — does not cloak its stormwater charges in *per se*, statutory reasonableness for the purposes of the Federal-Facilities Section.  Nor for that matter is the appeal process a "requirement[]" to which the government must adhere pursuant to 33 U.S.C. § 1323(a).

The statute's plain language, case law interpreting the statute, and even the statute's legislative history all mandate rejection of Wilmington's argument.  The Court evaluates each of these before turning to Wilmington's arguments.

We begin with the statute's text.  Section 1323(a) instructs agencies to comply with "local requirements . . . respecting the control and abatement of water pollution." 33 U.S.C. § 1323(a).  As an initial matter, a straightforward reading indicates that Wilmington's appeal process does not govern, does not involve, and thus is not "respecting the control or abatement of water pollution."[34]  The Wilmington Code describes the appeal process as one property owners can undertake to dispute the amount of their charges.  Wilmington Code § 45-53(d)(7).  Appealing a charge, self-evidently, has nothing to do with "the control and abatement of water pollution." *See id.* (describing the following grounds for appeal: "(1) the calculation of the storm water charge; (2) the assigned storm water class; (3) the assigned tier, if applicable; and (4) the eligibility for a credit").

Although the case law interpreting the term "requirements" in Section 1323 is sparse, it supports defining "requirements" in a way that does not include Wilmington's appeal process.  The Supreme Court, for example, in *EPA v. California*,

---

[34] Wilmington cites *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. --, 138 S. Ct. 1752, 1759 (2018), for the following dictionary definition of "respecting": "in view of: considering; with regard or relation to: regarding, concerning."  Pl. Resp. at 38.  That definition does not help Wilmington, as the City does not explain — and the Court does not see — how Wilmington's appeal process is "regarding" or "concerning" the control or abatement of water pollution. Indeed, the City then references "the illustrative fee adjustments appeal example in Wilmington's [Storm Water Credits and Fee Adjustments Appeals] Manual," in which a hypothetical commercial property owner "obtained a revised runoff coefficient."  *Id.*  The City argues that this illustration shows that a property owner could "[r]eplace more of asphalt or gravel with grass, and the City would reward the efforts to further limit stormwater pollution with still lower stormwater charges."  *Id.*  This example, however, merely clarifies that Wilmington's appeal process is both optional (rather than a "requirement") and a process respecting the revision of prospective *charges*, not respecting stormwater pollution.

adopted the view of the United States Court of Appeals for the Ninth Circuit that "requirements" refers "'simply and solely to substantive' standards, to effluent limitations and standards and schedules of compliance." 426 U.S. at 215 (quoting *California ex rel. State Water Res. Control Board v. EPA*, 511 F.2d 963, 969 (9th Cir. 1975)).[35] Under this definition, Wilmington's appeal process is not a "requirement."

The few district courts that have addressed the issue also read the term "requirements" like this Court reads it.  *See In re ACF Basin Water Litigation*, 467 F. Supp. 3d 1323, 1337 (N.D. Ga. 2020) ("The Supreme Court has stated that the requirements that can be enforced against federal agencies under [the Federal-Facilities Section] are limited to objective state standards of control, such as effluent limitations in permits, compliance schedules and other controls on pollution applicable to dischargers." (citing *EPA*, 426 U.S. at 215)); *New York v. United States*, 620 F. Supp. 374, 384 (E.D.N.Y. 1985) (defining Clean Water Act "requirements" as "objective, administratively predetermined effluent standard[s] or limitation[s] or administrative order[s] upon which to measure the prohibitive levels of water pollution"); *Kelley ex rel. Michigan v. United States*, 618 F. Supp. 1103, 1108 (W.D. Mich. 1985) (defining Clean Water Act "requirements" as state statutes that "provide objective, quantifiable standards subject to uniform application," and holding that statutes making it unlawful to discharge into state waters any substance that may become harmful to public welfare and providing causes of action for that behavior were *not* Clean Water Act "requirements").[36]

---

[35] As discussed in Section I.B, *supra*, Congress amended the Clean Water Act in 1977 in response to *EPA v. California*.  Nevertheless, Congress did not alter the Court's definition of "requirements" — the amended statute did not, and does not, expressly define "requirements." *See New York v. United States*, 620 F. Supp. 374, 382 (E.D.N.Y. 1985) (explaining that Congress did not expand the definition of substantive requirements in the 1977 Amendments and that "to the degree the Supreme Court's ruling in *EPA v. California* . . . construed the substantive 'requirements' of § 313 to mean effluent limitations, such ruling was unaffected by the 1977 amendments enacted by Congress").  Wilmington's appeal process also would not qualify as a procedural requirement even under the examples in the statute's legislative history; as cited *supra* note 5, a 1977 Senate report listed several examples of "procedural provisions" covered by "requirements," none of which resembles the appeal process:  "requirements to obtain operating and construction permits, reporting and monitoring requirements, any provisions for injunctive relief and such sanctions imposed by a court to enforce such relief, and the payment of reasonable service charges."  S. Rep. No. 95-370, at 67.

[36] Wilmington did not cite any definition of "requirements," under the Clean Water Act or any other statute, or any case law, suggesting that Wilmington's appeal process applies to the federal government.  The government, in contrast, bolsters its argument that the City's appeal process is not a "requirement" under the statute by citing cases that interpret the word "requirements" as used in similar statutes; this Court agrees that none of the definitions of

Additionally, legislative history, though not dispositive, supports the idea that Wilmington's appeal process does not concern the control or abatement of water pollution.  As explained above, Congress amended the Clean Water Act in 1977 to address the Supreme Court's decision in *EPA v. California*, 426 U.S. 200 (1976), that the statute as then-written did not require federal agencies to pay for permits.  *See supra* Section I.B.  Wilmington thus correctly notes that the purpose of the 1977 Amendments, in part, "was to 'unequivocally' subject 'all Federal facilities and activities . . . to all of the provisions of State and local pollution laws.'"  Pl. Resp. at 18 (quoting S. Rep. No. 95-370, at 67 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4392).  But Wilmington's reliance upon legislative history is misplaced.  First, such history cannot supplant the plain meaning of the statute.  Second, the Senate Report itself indicates that the 1977 Amendments were intended to subject federal facilities to procedural requirements related to controlling pollution, such as "requirements to obtain operating and construction permits, [and] reporting and monitoring requirements."  S. Rep. No. 95-370, at 67.  The government thus argues, and this Court agrees, that "a fee adjustment process is not at all similar to those example procedural requirements" cited in the Senate Report.  Def. Mot. at 42.

Undaunted, Wilmington continues to push its twice-rejected thesis that the government had to comply with the City's appeal process.  First, Wilmington again argues that the appeal process qualifies as a statutory "requirement" that the government is obligated to follow.  Pl. Resp. at 39.  Second, Wilmington asserts that Delaware state law mandates exhaustion.  *Id.* at 40.  And third, Wilmington contends that the government can pay the bills under protest and then sue for their return.  *Id.* at 9.  The Court addresses each argument *seriatim*.

*First*, Wilmington argues that the United States is subject to Wilmington's appeal process because that process is "easily understood as a procedural requirement" and the Clean Water Act subjects the federal government to local "administrative authority."  Pl. Resp. at 39 (quoting 33 U.S.C. § 1323(a)).[37]  As discussed above, the

---

"requirements" in those cases, even if applied to the Clean Water Act, would include Wilmington's appeal process.  *See* Def. Mot. at 41–43 (citing *Hancock v. Train*, 426 U.S. 167, 187 (1976) (Clean Air Act); *Fla. Dep't of Env't Regul. v. Silvex Corp.*, 606 F. Supp. 159, 162–63 (M.D. Fla. 1985) (RCRA); *Romero-Barcelo v. Brown*, 643 F.2d 835, 855 (1st Cir. 1981), *rev'd on other grounds sub nom. Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) (Noise Control Act)).  In each of the cited cases, the court did not interpret the word "requirements" to include anything analogous to Wilmington's appeal process.

[37] "Each department, agency, or instrumentality . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, *administrative authority*, and process and

statute's language, as well as case law interpreting its language, foreclose this argument.

*Second*, Wilmington attempts to support its exhaustion argument on state law grounds. Pl. Resp. at 40 ("[T]he United States does not deny that Delaware requires exhaustion from its property owners."). It is irrelevant, though, whether Delaware law requires property owners to exhaust administrative remedies. As noted in *Wilmington I*, "[w]here '*Congress* has not clearly mandated the exhaustion of particular administrative remedies, the exhaustion doctrine is not jurisdictional, but is a matter for the exercise of sound judicial discretion.'" 136 Fed. Cl. 628, 632–33 (emphasis added) (quoting *Maggitt v. West*, 202 F.3d 1370, 1377 (Fed. Cir. 2000)). In this case, neither Congress nor the Wilmington Code has mandated exhaustion. *See* 33 U.S.C. § 1323; Wilmington Code § 45-53(d)(7).

Mandating exhaustion thus falls to judicial discretion — and sound judicial discretion prevents mandating exhaustion in this case. For the reasons discussed above as well as in *Wilmington I*, Wilmington's appeal process is not reasonable. Section 45-53(d)(7) of the Wilmington Code applies only prospectively and does not allow adjustments of prior billing cycles. JSUF ¶ 112; Tr. 71:1–5, 102:23–103:4; JX 40 at WILM0012020. And before Wilmington even considers adjusting a property's stormwater charges, the property owner must pay all outstanding charges. Tr. 103:5–15. Thus, as Judge Williams noted in *Wilmington I*, pursuing Wilmington's appeal process could require the United States to pay unreasonable charges — something the language of Section 1323(c) expressly precludes. 136 Fed. Cl. at 633; 33 U.S.C. § 1323(c).

*Third*, Wilmington posits that property owners should pay charges "under protest" and then "bring[] an action against the city to recover [them] back." Pl. Resp. at 9 (first quoting *Murphy v. City of Wilmington*, 11 Del. 108, 138 (1880); and then citing *Mr. Kleen, LLC v. New Castle Cnty. Dep't of Special Servs.*, 2014 WL 4243562 (Del. Sup. Ct. Aug. 19, 2014)). Even if Delaware law provides for such an option — something the Court accepts only for the sake of argument here — this does not help Wilmington's case because it means that property owners who have been charged unreasonable sums have recourse, if at all, only as a plaintiff claiming a refund and not through Wilmington's appeal process. Indeed, even according to the City, the government's only remedy here with respect to past fee assessments is to pay the charges and then sue for a refund. Such an approach ignores the terms of the Clean Water Act which require the federal government only to pay charges where the statute commands it. Wilmington cannot use its appellate process to force the government to pay and sue for

---

sanctions *respecting the control and abatement of water pollution*[.]" 33 U.S.C. § 1323(a) (emphasis added).

a refund as if the federal government itself were a plaintiff-claimant in this Court (or any other).  Again, Section 1323(c) does not allow the government to pay unreasonable charges that do not comply with the statute, and nothing in the Federal-Facilities Section requires the government to pay first and seek a refund later.  *See Nat'l Fed'n of Ind. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. --, 2022 WL 120952, at *7 (Jan. 13, 2022) (Gorsuch, J., concurring) ("Congress does not usually 'hide elephants in mouseholes'" (quoting *Whitman v. Am. Trucking Ass'ns.*, Inc., 531 U.S. 457, 468 (2001))).

Finally, *even if* this Court were to interpret the fee-adjustment process as generally mandatory, the government would not be required to exhaust it here.  Wilmington concedes that the fee-adjustment process cannot provide the government's requested relief — retroactive adjustment of past charges.  JX 40 at WILM0012020 ("There will be no retroactive adjustments for prior billing periods."); Tr. 191:15–25.  And exhaustion is not mandatory when an agency cannot grant the requested relief.  *Cf. McCarthy v. Madigan*, 503 U.S. 140, 146–48 (1992) (describing a situation in which a federal agency "lack[s] authority to grant the type of relief requested" as a "set[] of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion"), *cited in Fredericks v. United States*, 125 Fed. Cl. 404, 411–12 (2016).

Further, the government would be forced to pay all outstanding charges before beginning the fee-adjustment process — even unreasonable charges that by law may not be imposed in the first place on the federal government.  JX 40 at WILM0012021 ("All storm water charges that are outstanding at the time of the application must be paid in full prior to the city commencing the technical review."); Tr. 103:5–15, 194:5–195:5.  The government therefore has no remedy under Wilmington's appeal process to dispute past unreasonable charges without paying them first, something forbidden by Section 1323, as the Court explained above.

Wilmington contends that *United States v. Testan*, 424 U.S. 392 (1976), "derail[s]" this point.  Pl. Resp. at 40–41.[38]  The legislative scheme at issue in *Testan* and that at

---

[38] The entirety of Wilmington's argument, which is difficult to track, is as follows:

> The United States' first argument [that the appeal process is inadequate because it would not grant retroactive adjustment of past charges] is derailed by *United States v. Testan*.  There, the Supreme Court explained that because the respondents "have an administrative avenue for prospective relief available to them under the elaborate and structured provisions of the Classification

issue here, however, are as different as proverbial apples and oranges, and *Testan*'s holding does not support Wilmington's arguments.  At issue in *Testan* was a federal scheme governing federal employee pay and via which Congress circumscribed the remedies available to federal employees for incorrect payments.  424 U.S. at 403–04 ("The situation, as we see it, is not that Congress has left the respondents remediless, as they assert, for their allegedly wrongful civil service classification, but that Congress has not made available to a party wrongfully classified the remedy of money damages through retroactive classification.").  In this case, in contrast, Wilmington is seeking damages which must qualify under the Clean Water Act's limited waiver of sovereign immunity.  Am. Compl. ¶ 3 ("The United States . . . continues to deny[] its obligation under the Clean Water Act, 33 U.S.C. § 1323(a), to pay Wilmington reasonable service charges for stormwater management assessed against its properties located in Wilmington").

Here, accordingly, the question is whether the Clean Water Act mandates the government to pay Wilmington's invoices.  Wilmington's contention that the government could have challenged the charges in the City's appeal process is spurious, as the government notes, Def. Mot. at 44, because such a challenge would not affect charges already assessed which may have violated the Clean Water Act.  If Congress had circumscribed the government's remedies in Federal-Facilities Section cases — by, say, declaring all invoices assessed under that section presumptively proper and subject only to challenge via municipal appeal processes — this would be a different case.  In the absence of such limiting language, however, the government is permitted to defend against the City's charges on the grounds that the charges do not comply with the Clean Water Act.

## VI.     THE UNITED STATES DOES NOT OWE INTEREST TO WILMINGTON

Wilmington claims the government owes the City interest accrued over the past decade due to the government's refusal to pay Wilmington's outstanding stormwater charges.  Compl. at 10 (requesting $1,185,929.24 in interest).  By the time of trial, Wilmington had assessed the government over $3.3 million in interest.  Am. Compl. at 14 (requesting $3,360,441,32 in interest).  In *Wilmington I*, the government moved for

---

Act . . . ," they "are not entirely without remedy.  They are without the remedies in the Court of Claims of retroactive classification . . . to which they assert they are entitled.  Additional remedies of this kind are for the Congress to provide and not for the courts to construct."  *United States v. Testan*, 424 U.S. 392, 403–04 (1976).

Pl. Resp. at 40–41.

partial judgment on the pleadings as to the interest issue, arguing that Wilmington could not recover interest as a matter of law because Section 1323 does not explicitly waive sovereign immunity to recover interest.  136 Fed. Cl. at 630.  The Court declined to resolve the interest question at that time because it "raise[d] a thorny issue of first impression in this Court."  *Id.* at 634.

The Court today holds that Wilmington cannot claim interest from the government for the unpaid Clean Water Act charges even if the government were liable to Wilmington for the principal charges it assessed.

This Court can only award interest "under a contract or an Act of Congress expressly providing for payment thereof."  28 U.S.C. § 2516(a).  The Supreme Court also has articulated a general "no-interest rule": "In the absence of express congressional consent to the award of interest separate from a general waiver of immunity to suit, the United States is immune from an interest award."  *Library of Congress v. Shaw*, 478 U.S. 310, 314 (1986).  In *Shaw*, the Court held that a litigant who was entitled under statute[39] to a reasonable attorney's fee and costs after winning an employment suit against the federal government was not entitled to interest on the attorney's fee because the statute did not separately waive sovereign immunity for interest.  *Id.* at 311, 323.  The Court noted that this no-interest rule had been recognized "[f]or well over a century."  *Id.* at 316.  The Court further rejected plaintiff's contention that the statute waived sovereign immunity from interest "by equating the United States' liability to that of a private party." *Id.* at 319.  Importantly, the Court noted that neither the statute nor legislative history references interest; such "congressional silence d[id] not permit [the Court] to read the provision as the requisite waiver of the Government's immunity with respect to interest."  *Id.*

The Federal Circuit has repeatedly expanded upon the no-interest rule, noting, for example, that "the waiver for sovereign immunity for interest must be distinct from a general waiver of immunity for the cause of action resulting in the damages award against the United States."  *Marathon Oil Co. v. United States*, 374 F.3d 1123, 1126–27 (Fed. Cir. 2004).  Such waivers, the Federal Circuit held, "'must be unequivocally expressed,' or a court must infer that Congress did not intend to create a waiver."  *Id.* at 1127 (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).  In *Marathon Oil*, the Federal Circuit held that oil companies who successfully sued the United States for a breach of contract were not entitled to post-judgment interest because the statute under which they sued did not contain a separate, unambiguous sovereign immunity waiver

---

[39] The statute at interest in *Shaw* made the government "liable 'the same as a private person' for 'costs,' including 'a reasonable attorney's fee.'"  478 U.S. at 317–18 (quoting 42 U.S.C. § 2000e–5(k)).

for interest.  374 F.3d at 1125.  The statute at issue "require[d] the government to pay post-judgment interest on 'all final judgments against the United States in the United States Court of Appeals for the Federal Circuit," *id.* at 1126 (quoting 28 U.S.C. § 1961(c)(2)), but "trigger[ed] a chain of cross[-]references that link[ed] four distinct statutory provisions," *id.* at 1128.  Because the interaction between the cross-referenced statutes was "subject to plausible readings under which Congress has not waived sovereign immunity for post-judgment interest," the Federal Circuit concluded that "Congress has not unequivocally excluded the narrower reading of the relevant statutes" and held that plaintiffs could not recover interest.  *Id.* at 1132.  The Federal Circuit continues to invoke and apply the no-interest rule.[40]

*Shaw*, *Marathon Oil*, and 28 U.S.C. § 2516(a) all mandate that the government is only liable for interest when the law at issue contains an express waiver of sovereign immunity for interest.  Nowhere in the Federal-Facilities Section is there such a waiver.  Thus, the government would not be liable for interest even if Wilmington's charges qualified as "reasonable service charges" under the statute.

In response, Wilmington argues that the following sentence in Section 1323(a) waives sovereign immunity for interest regardless of the no-interest rule: "This subsection shall apply *notwithstanding any immunity* of such agencies, officers, agents, or employees *under any law or rule of law*."  Pl. Resp. at 43 (quoting 33 U.S.C. § 1323(a)).  Wilmington claims that this sentence waives the no-interest rule because "there is no plausible way to interpret 'notwithstanding any immunity . . . under any law or rule of law' to exclude interest."  Pl. Resp. at 44 (quoting 33 U.S.C. § 1323(a)).

The Court disagrees.  The sentence to which Wilmington points certainly indicates that federal instrumentalities cannot use "any immunity" to escape the provisions of Section 1323.  But no provision provides for interest.  Section 1323 does

---

[40] *See, e.g.*, *Shell Oil Co. v. United States*, 7 F.4th 1165, 1174 n.3 (Fed. Cir. 2021) (reiterating that interest cannot be recovered in a suit against the United States without an express waiver); *Clay v. McDonough*, 2021 WL 4538675, at *2 (Fed. Cir. Oct. 5, 2021) (per curiam) (rejecting plaintiff's claim that he is entitled to interest because "'interest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest' . . . and [plaintiff] has not identified any such waiver" (quoting *Shaw*, 478 U.S. at 311)); *Athey v. United States*, 908 F.3d 696, 708–09 (Fed. Cir. 2018) (affirming Court of Federal Claims' denial of interest on Lump Sum Pay Act and Back Pay Act pursuant to the no-interest rule); *Bitzer v. Shinseki*, 429 F. App'x 984, 986 (Fed. Cir. 2011) ("Moreover, *Smith* [*v. Principi*, 281 F.3d 1384 (Fed. Cir. 2002)] . . . unequivocally rejected the argument that no matter how compelling the equities or public policy argument in favor of awarding interest, the Department [of Veterans Affairs] is without authority to do so in the absence of express statutory language").

not mention interest, so the general waiver of immunity language is of no help to Wilmington. *See Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, and will not be implied." (citations omitted)).  In short, the "subsection" may "apply" notwithstanding any assertion of immunity, but nothing in that subsection provides for the payment of interest.

The Federal Circuit has held that statutory language far more helpful to a plaintiff than that of the Clean Water Act does not permit the recovery of interest.  In *Smith v. Principi*, 281 F.3d 1384 (Fed. Cir. 2002), upon which the government relies, *see* Def. Reply at 16, the Federal Circuit addressed a statute that provided that the government could "provide such relief on account of such error as the Secretary determines *equitable*, including the payment of moneys to any person whom the Secretary determines is *equitably* entitled to such moneys."  *Smith*, 281 F.3d at 1387 (quoting 38 U.S.C. § 503).  The Federal Circuit concluded that such language did not waive sovereign immunity for the purposes of collecting interest.  *Id.* at 1387.  Section 1323 contains no language regarding interest that would make it more helpful to Wilmington than the language at issue in *Smith* was helpful to the plaintiff in that case. Indeed, if anything, Section 1323 makes clear, in defining the charges for which sovereign immunity *is* waived, that interest is *not* available.  Accordingly, *Smith* all but precludes interpreting Section 1323 as waiving sovereign immunity for interest.

Wilmington's other arguments similarly fail to overcome the no-interest rule. The government correctly observes that "[t]he plain language of 'service charges' encompasses charges for *service* — not charges for 'the time value of money and loss of use of amounts not paid when they are due.'"  Def. Mot. at 47 (quoting *Am. Airlines, Inc. v. United States*, 77 Fed. Cl. 672, 684 (2007)).  In response, Wilmington argues that "Congress statutorily defin[ed] . . . 'reasonable service charge' in Section 1323(c)(1) to include a qualifying 'fee, charge, or assessment' even if 'denominated a tax,' which supplants any alternative 'typical' meanings."  Pl. Resp. at 43 (citing *Van Buren v. United States*, 593 U.S. --, 141 S. Ct. 1648, 1657 (2021)).  This argument fails.  Even if "service charge" were defined broadly, as Wilmington urges, the statute nowhere mentions interest — and the "fee, charge, or assessment" language Wilmington points to is plainly not a waiver of immunity for a plaintiff to collect interest on any amounts owed. *See, e.g.*, *Shaw*, 478 U.S. at 314.

Wilmington also takes a stab at a negative implication argument, noting that Section 1323(a) does not explicitly bar recovery of interest like the Federal Tort Claims Act does.  Pl. Resp. at 44–45; *see also* 28 U.S.C. § 2674 ("The United States shall be liable

. . . in the same manner and to the same extent as a private individual . . . but shall not be liable for interest prior to judgment . . . .").

Wilmington apparently fails to grasp that the no-interest rule means exactly that. A statute must explicitly authorize interest for a plaintiff to collect it; statutes do not need to explicitly preclude interest because that is the default setting. As the government correctly responds, "[t]he question is not whether Congress prohibited interest under the [Clean Water Act], but whether Congress *expressly and affirmatively allowed it.*" Def. Rep. at 17 (emphasis added) (first citing *Marathon Oil*, 374 F.3d at 1126; then citing *Shaw*, 478 U.S. at 314).[41]

Finally, Wilmington argues that a Supreme Court case from 1921, *Missouri Pacific Railroad Company v. Ault*, is "more instructive" than the no-interest rule reinforced by *Shaw*. Pl. Resp. at 46 (citing *Missouri Pac. R.R. Co. v. Ault*, 256 U.S. 554 (1921)). This argument fails to overcome the no-interest rule. First, *Missouri Pacific Railroad Company* was decided over a century ago; to the extent the case conflicts with either *Shaw* or 28 U.S.C. § 2516(a), the latter case and statute are controlling.[42]

This Court reaffirms that absent an express statutory waiver of sovereign immunity for a plaintiff to charge or claim interest, a party cannot succeed on a claim of interest against the federal government. *Blueport Co., LLP v. United States*, 71 Fed. Cl. 768, 780 (2006) (explaining that plaintiff's "'waiver-through-statutory construction' arguments" demonstrated that the statutory language at issue was "*at best* ambiguous [and thus] not enough to constitute a waiver of sovereign immunity" (citing *Lane*, 518 U.S. at 195)). Because the Clean Water Act lacks such a waiver of sovereign immunity, Wilmington cannot recover interest from the United States in this case even if it were entitled to the principal charges.

## VII.   CONCLUSION

The bottom line is that the statute at issue, Wilmington's litigation strategy, and the evidence presented at trial collectively tie the Court's hands. Section 1323 requires that stormwater charges assessed against federal properties be based upon their proportional contribution to stormwater pollution. At trial, however, Wilmington

---

[41] Contrary to Wilmington's contention, this Court did not previously "acknowledge[]" that the Clean Water Act lacks a "prohibit[ion] of interest." Pl. Resp. at 45 (citing *Wilmington I*, 136 Fed. Cl. at 635).

[42] Additionally, *Shaw* does not cite or address *Missouri Pacific*, which indicates that the Court did not recognize *Missouri Pacific* to be a case about interest claims against the government.

failed to provide any evidence linking its charges at issue to the Properties' contribution to Wilmington's stormwater pollution.

For the above reasons, Wilmington has failed to prove that the charges it assessed the government qualified as "reasonable service charges" pursuant to the Federal-Facilities Section and, accordingly, the government's RCFC 52(c) motion for judgment on partial findings is **GRANTED**.  The Clerk is directed to enter judgment for defendant, the United States.

**IT IS SO ORDERED.**

s/ Matthew H. Solomson
Matthew H. Solomson
Judge